Dennis J. Roberts II, Atty. Gen., Margaret R. Levy, Sp. Asst. Atty. Gen., for plaintiff.

Edward J. Mulligan, Warwick, Raymond R. Pezza, Providence, for defendants.

OPINION

WEISBERGER, Justice.

This case comes before the court on appeal from a judgment of conviction entered in the Superior Court pursuant to an indictment charging the defendants with receiving stolen goods in violation of General Laws 1956 (1969 Reenactment) §§ 11–41–2 and 11–41–5, as amended by P.L.1980, ch. 318, § 1.[1] The defendants assert as a basis

STATE

v.

**Roger WILLIAMS and Robert St. Germain.**

No. 81–497–C.A.

Supreme Court of Rhode Island.

June 14, 1983.

Reargument Denied July 8, 1983.

---

1. General Laws 1956 (1969 Reenactment) § 11–41–2 reads as follows:

"Every person who shall fraudulently receive any stolen money, goods, securities, chattels or other property, knowing the same to be stolen shall be deemed guilty of larceny, although the person who stole the same may not have been prosecuted or convicted therefor; and the possession of any such stolen property shall be evidence of guilty knowledge by the person having such possession that such property was stolen, except such person shows that it was acquired in the due

for their appeal that the trial justice was in error in denying the defendants' motions for judgments of acquittal. We agree with this contention and therefore reverse the judgment of conviction. The facts of the case insofar as they are pertinent to the motions for judgment of acquittal are as follows.

On March 25, 1980, Roger Williams (Williams) and Robert St. Germain (St. Germain) were present in a place of business owned by Williams and known as the Coventry Coin & Antiques Shop (Coventry Coin Shop). St. Germain assisted Williams from time to time in waiting on customers, arranging coin collections and organizing material that was purchased at the coin shop. As part of the coin shop business, rings, costume jewelry and artifacts made of gold or silver were brought to the store by a variety of patrons or customers. The items were then weighed for their precious-metal content and purchased from the patron for a sum based thereon. Some of these items were sold to a refiner for melting. Others were retained at the coin shop and later either sold to customers who would examine merchandise in the display counter or sold through a "flea-market" type of outlet.

On or about March 24, 1980, Robert Crispi (Crispi) took a ring from the home of Mrs. Helen Grasso from its resting place on Mrs. Grasso's bathroom counter. Crispi had access to the home because he was friendly with Mrs. Grasso's daughter, Doreen, and visited her from time to time. Mrs. Grasso neither knew that Crispi took the ring nor gave him permission to take it. The ring consisted of two bands of gold in which was set a marquise-cut diamond with a faceted girdle. At the time that Crispi stole the ring, he had no knowledge of the value of the ring or the nature of the stone that it contained.

The next day Crispi went to the Coventry Coin Shop and brought with him the Grasso

ring. He also had in his possession a silver money clip (which had been given to him by Mrs. Grasso's daughter), a silver dime, and a silver pin. Both St. Germain and Williams were present in the shop. Although it is not entirely clear from the testimony which of the two waited upon Crispi, the evidence indicates that both men spoke to him. It is undisputed that he had previously brought metal to the store for sale. St. Germain weighed the items for their precious-metal content and had Crispi fill out and sign a card which described in general that he had brought a ring and other items. The card further contained a printed statement certifying that the items sold were the property of Crispi and were unencumbered and that he was of lawful age. For this merchandise, Crispi was given the sum of $15.50. Apparently, the sum attributable to the purchase of the ring alone was $9.

Later, on or about March 28, 1980, Crispi returned to the Coventry Coin Shop and stated that he wanted the ring returned to him. He was told by St. Germain that the ring had probably been melted down, although St. Germain testified that he stated his willingness to return the ring if it were still available. Williams and St. Germain showed Crispi the rings in the display cases, looked around in the scrap pile, but could not find the ring. Thereupon Crispi left. Within a few minutes Detective Phillips of the Coventry police department called and suggested that Williams be on the lookout for a stolen diamond ring. Phillips also suggested that he should be on the lookout for "a fellow named Crispi." Williams stated that Crispi had just left.

A few days later Williams received a telephone call from the Coventry police department suggesting that Mr. and Mrs. Grasso would come to the shop to look at rings. Apparently the ring was described as a "pear shaped" diamond ring. The Grassos came to the shop, looked at a num-

---

course of trade and for adequate consideration."
Section 11–41–5, as amended by P.L. 1980, ch. 318, § 1 sets the penalty for receipt of stolen goods exceeding $500 in value at a maximum term of ten years' imprisonment or a fine of not more than $5,000 or both.

ber of rings, but did not find the stolen diamond.

During the last week in March upon a date not specifically ascertained, Williams brought a ring to a jeweler named David Holmes. Mr. Holmes could not recall whether Williams had more than one ring at the time. He did state, however, that the ring that he examined included a marquise diamond and that the stone had an approximate value of $5,000.

Later, on April 14, 1980, Crispi called Williams from the Coventry police department at the suggestion of Detective Thomas K. Jones. Crispi told Williams that he had given a diamond ring to St. Germain, that the ring was stolen, and that he had just been arrested. Williams denied having any knowledge of the ring. Thereafter, Crispi made a second phone call inquiring further about the ring. Williams emphatically stated that any rings that he had available were already shown to the Grassos and that he did not know anything about a diamond ring purchased from Crispi. These conversations were recorded by the Coventry police and were introduced into evidence at the trial and were placed before the jury.

On that same date, Mrs. Grasso again came to the Coventry Coin Shop with Detective Jones and was again shown a number of rings placed on the counter. From a group of about ten or fifteen rings, Mrs. Grasso stated that one looked like the ring in question; she tried it on and found it a little tight because the two bands had been separated. Nevertheless, she identified the ring as hers. Subsequently this ring was introduced into evidence and marked as state's exhibit No. 1. At the trial Mrs. Grasso identified this ring as the same ring that had been stolen from her home.

On the basis of the foregoing evidence, defendants were convicted of knowingly receiving stolen goods. In his charge to the jury, the trial justice instructed the jury that "you must * * * consider whether the [s]tate has proven beyond a reasonable doubt that on March 25 or the date the ring was transferred each [d]efendant knew of the fact the ring was stolen." This succinct statement by the trial justice is the heart of this case. In considering a motion for judgment of acquittal, it was necessary for the trial justice to determine whether the evidence in the case, when viewed in the light most favorable to the state, would justify a trier of fact, drawing all reasonable inferences consistent with guilt, in finding: (1) that defendants had actual or constructive knowledge at the time they received the ring in question that it had been stolen and (2) that this fact had been proven beyond a reasonable doubt. We are of the opinion that this evidence falls woefully short of such a quantum of proof even when it is viewed in the light most favorable to the state.

The evidence clearly shows that a diamond ring was stolen from Mrs. Grasso. It further shows that the same ring was presented at the Coventry Coin Shop the next day and that it was valued at $9 by either St. Germain or Williams or both. Thus the evidence even when viewed in the light most favorable to the state leads inevitably to the conclusion that neither Williams nor St. Germain had any idea of the value of the ring. There is not one shred of evidence in the case that either man had any expertise in evaluating precious stones. Both had some experience in the weighing and valuing of coins, sterling silver, and gold, but there is utterly no evidence of experience or knowledge of the value of diamonds or other precious stones. In addition, Crispi had brought merchandise to the coin shop previously under circumstances that would not have raised any suspicion that the merchandise had been stolen. Both men were in the business of accepting costume jewelry and varied artifacts from a wide variety of persons for the value of the metal contained therein. This transaction was carried out under the same or similar circumstances.

It is true that § 11–41–2 provides that the possession of "stolen property shall be evidence of guilty knowledge by the person

having such possession that such property was stolen, except such person shows that it was acquired in the due course of trade and for adequate consideration." The state argues that $9 was scarcely adequate consideration for a ring worth thousands of dollars. Although incontrovertible, this argument completely misses the mark. Had Williams or St. Germain any reason to believe on March 25 that the ring was worth thousands of dollars, the argument would have great force. In fact, however, the only evidence submitted by either party leads to the conclusion that on March 25 none of the actors in this drama had any reason to believe that this ring had anywhere near the value that it later was found to have.

At most, the evidence might bear a strong suspicion that Williams, after March 25, learned from a qualified appraiser that the ring in his possession was worth a considerable amount of money and that he should have associated this ring with the one brought to him by Crispi. In all likelihood, Williams was slower than he should have been in connecting these two events. He may have felt that he was the recipient of a windfall that a completely honest person might have attempted to deal with by asking former patrons whether they had mistakenly sold a ring for less than its value.[2] It was not until April 14 that it was unequivocally called to Williams's attention that Crispi had stolen the ring from Mrs. Grasso. Nevertheless, it was on that same day that the ring was produced and returned to its rightful owner.

It may well be that a police officer might reasonably suspect that, on a date after March 25, Williams and/or St. Germain "knew of facts sufficient to satisfy a reasonable man that the property was stolen."

*State v. O'Neill,* 53 R.I. 497, 499, 167 A. 263, 264 (1933). However, there is no evidence, circumstantial or otherwise, that either of the accused had knowledge of such facts at the critical time of receiving the stolen goods. There is not a scintilla of evidence to indicate that defendants knew that Crispi was a thief. Although counsel for the state emphasized in argument that Crispi was a man of nefarious background and prior convictions, there is utterly no proof in the record that defendants were aware of these circumstances.

Considering this evidence in the light most favorable to the state and drawing every reasonable favorable inference therefrom consistent with guilt, as suggested in *State v. Ahmadjian,* R.I., 438 A.2d 1070, 1084 (1981), we feel that there is an insufficient quantum of proof to establish beyond a reasonable doubt that either defendant was aware, on the date of the purchase, that the ring in question was either significantly valuable or that it had been stolen.

In light of the foregoing determination on the motions for judgment of acquittal, it becomes unnecessary to consider the other points raised by the defendants concerning admission of evidence of the recorded conversation, the denial of the defendants' motion for severance, limitation of cross-examination, or the effect of the statutory inference concerning guilty knowledge.

For the reasons stated, the appeal of the defendants is hereby sustained, the judgment of conviction is reversed, and the case is remanded to the Superior Court with directions to enter judgments of acquittal for the defendants Roger Williams and Robert St. Germain.

2. Our dissenting brethren suggest that Williams's actions subsequent to March 25 were equivocal and evasive. We are in agreement that Williams probably had sufficient information by April 1 to cause a reasonable man to be placed upon inquiry concerning the ring that had been sold by Crispi. The application of hindsight to a set of circumstances may often result in the supplying of elements of which the participants could not have been aware at the time. These developments subsequent to the date of initial purchase do not supply evidence of guilty knowledge on March 25. That is the date upon which the state's case must stand or fall. The defendants are not chargeable on March 25 with knowledge that subsequently came to their attention.

Mr. Justice Kelleher, with whom Mr. Justice Shea joins, dissenting. My disagreement with the majority centers solely on its conclusion that the trial justice erred in denying Williams's motion for a judgment of acquittal. I have no quarrel with the grant of St. Germain's acquittal motion. After Williams's initial motion for judgment of acquittal was denied, he presented evidence and rested and then renewed the motion. By presenting evidence, he waived any right to consideration of the initial motion, and consequently our review focuses on the denial of the second motion. *State v. Roddy*, R.I., 401 A.2d 23, 32 (1979).

When considering a motion for judgment of acquittal, we, like the trial justice, are not concerned with the credibility of witnesses or the weight of the evidence, but rather we consider only that evidence which the state claims is generating guilt beyond a reasonable doubt, viewing such evidence in the light most favorable to the state and drawing from it any reasonable inference consistent with guilt. *State v. Dionne*, R.I., 442 A.2d 876 (1982); *State v. Sabitoni*, R.I., 434 A.2d 1339 (1981).

The record indicates that on March 25, 1980, Crispi came to Williams's coin shop carrying with him a diamond ring that on that date had a value of $8,000 [3] as well as a sterling silver money clip, a silver dime, and a silver pin. Williams examined the ring with a magnifying glass and a light. When Crispi asked Williams if the ring contained a real diamond, Williams said it was a piece of glass. Williams asked Crispi if the ring had been stolen. Crispi had been in the store on several earlier occasions selling various articles of jewelry, including a gold wedding band.

The diamond ring had been stolen from the mother of Crispi's girlfriend. The mother described the ring as a one-karat marquise diamond. On April 1 when she, her husband, and the police went to Williams's shop, Williams told them that he could be of no help because it had been

"months" since he had purchased a marquise diamond "through his shop" and insisted he had never purchased such a ring from Crispi. Interestingly enough, the April 1 incident consisted of two trips to the shop. On the second trip, only the husband and the police showed up. Williams showed them a solitaire diamond that he had purchased, but the husband quite promptly said that was not his wife's ring. In a phone conversation that was taped, Williams told the police that he was trying to trick the husband because he did not believe the marquise diamond had been stolen.

On April 14 the husband, the wife, and the police returned to the shop with the detectives; there on the counter was the wife's diamond ring, and Williams also gave the husband his silver money clip. According to police testimony, Williams had told them that the purchase had "slipped his mind." Williams also told them that he had found the ring with the "flea market" stuff. At trial Williams told the jury that the ring was part of a group of rings which he kept in the safe. He had no idea how the ring had moved from the safe to the receptacle in which the flea-market junk was collected.

It is my belief that Williams's reference to his past experiences with a marquise diamond and his use of the shop's safe to store the ring give rise to an inference that he was well aware of the true status of the "piece of glass" delivered to his shop by Crispi.

KELLEHER and SHEA, JJ., dissented.

---

**3.** This estimate of value was given by the senior appraiser at Holmes Jewelers. The $5,000 figure cited in the majority's opinion was given by the senior appraiser's son.