**STATE**

v.

**Winfield SNOW.**

**No. 94–388 C.A.**

Supreme Court of Rhode Island.

Feb. 5, 1996.

Andrea Mendes, Special Asst. Atty. General, Aaron Weisman, Asst. Atty. General, for Plaintiff.

Edward J. Romano, Providence, for Defendant.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of the defendant, Winfield Snow, from a judgment of conviction of one count of first-degree murder and one count of conspiracy to commit robbery. The defendant received a life sentence on the murder charge and a consecutive term of ten years on the conspiracy count. On appeal, the defendant has raised four issues, challenging (1) the denial of his motion for a new trial, (2) the denial of his motion for a judgment of acquittal, (3) the propriety of the state's questioning of a defense witness, and (4) the denial of his motion to dismiss. For the reasons stated below, we deny the defendant's appeal and affirm the judgment of the Superior Court. The facts insofar as pertinent to the issues raised on appeal are briefly summarized.

### Facts and Procedural History

At approximately 8:18 p.m., on January 18, 1991, the Woonsocket police responded to a call and discovered one Peter Zmetra (Zmetra) lying in a pool of blood in the driveway of a house at 171 Carnation Street. A few moments later, rescue personnel arrived at the scene and transported Zmetra to the Landmark Medical Center, where the victim was pronounced dead. At defendant's trial, Francis Perretti, M.D. (Perretti), a forensic pathologist, testified that in the course of performing an autopsy on Zmetra, he located three gunshot wounds on the victim's body and concluded that the cause of Zmetra's death was "multiple gunshot wounds resulting in bleeding, hemorrhage." Richard Wilkinson, Ph.D., of the University of Rhode Island crime lab testified that three bullets were recovered in connection with Zmetra's death and that all three were fired from the same weapon.

Five months after the shooting, in the early morning hours of June 22, 1991, Mi-

chael Giroux (Giroux) and Brian Snell (Snell) went to the police and volunteered statements in which both men admitted their involvement in Zmetra's murder but claimed that it was defendant who had actually shot Zmetra. Giroux and Snell were arrested and charged with first-degree murder and conspiracy to commit robbery. In exchange for agreeing to testify for the state at defendant's trial, Snell was permitted to plead nolo contendere to an amended charge of second-degree murder and to one count of conspiracy to commit robbery. Snell was subsequently sentenced to serve five years of a twenty-year sentence, with fifteen years suspended on the murder charge and a concurrent sentence of ten years, five years to serve and five years suspended on the conspiracy count. Giroux also pleaded nolo contendere to second-degree murder and conspiracy to commit robbery.

As a result of the statements given by Giroux and Snell the Woonsocket police issued a warrant, and the Milford, Massachusetts, police arrested defendant at his girlfriend's residence where, at the same time a police scanner, was seized. On July 16, 1991, an indictment was filed, charging defendant with one count of first-degree murder and one count of conspiracy to commit robbery. The defendant was extradited over objection, ordered held without bail, and remanded to the Adult Correctional Institutions (ACI). On June 25, 1992, defendant's motion to dismiss was denied, and on September 8, 1992, a jury trial commenced.

At trial Snell testified regarding defendant's involvement in the conspiracy to rob and the murder of Zmetra in January 1991. According to Snell's testimony, Giroux initially suggested that Giroux and Snell rob Zmetra on a Friday evening because Zmetra collected rents on Fridays and was likely to be carrying large sums of money on those evenings. Snell further testified that when Giroux became concerned that Zmetra might recognize Giroux, Giroux suggested that they engage defendant to aid in the robbery. According to Snell, he and Giroux went to defendant's apartment, and when defendant agreed to participate, the three men proceeded to plan the robbery.

According to Snell's testimony, defendant suggested that the men wear dark clothing, cover their faces, and use a stolen car on the night of the planned robbery. Snell testified that it was also defendant who proposed that Snell "take him [Zmetra] down and hold him," while defendant took Zmetra's money. Snell further stated that because he and Giroux were unable to steal a car, they used Giroux's girlfriend's white four-door Pontiac on which they placed a stolen license plate.

Snell testified that, at approximately 7 p.m. on January 18, 1991, he and Giroux went to defendant's apartment, where defendant and Snell dressed in dark clothing as planned. Snell also stated that he witnessed defendant showing Giroux a gun in the apartment and saw defendant retrieve a police scanner from defendant's car to bring with them. According to Snell, the three left defendant's apartment in Giroux's girlfriend's car at approximately 7:30 p.m. and soon located Zmetra leaving an apartment building and entering his pickup truck. The three men then circled the block to give Zmetra "time to get to his girlfriend's house," stopped to put the stolen license plate on the car, and proceeded to Carnation Street where they saw Zmetra's car parked in front of the driveway of Wanda Bergeron's house at 171 Carnation Street. Snell testified that Giroux stopped the car, and Snell and defendant, who was holding a gun, left the car, walked around the house, and waited on the side of the house for Zmetra to come out.

According to Snell, as Zmetra left the house and walked down the front stairs, Snell "jumped him" and "pushed him into the side of the house." At that point, Snell slipped, and when Zmetra "came around swinging," Snell ran toward the back of the house. Snell testified that as he was running, he heard two shots fired, stopped, turned around, and saw "flashes of a gun going off" in defendant's hand and Zmetra's body on the ground. The two men then "walked down the driveway, crossed the grass and ran across the street, got into the car" and rode away from the scene.

Several neighbors on Carnation Street testified that they heard the shooting at approximately 8 p.m. and saw two people wearing

dark-colored clothes and masks leave the property at 171 Carnation Street, run across the street, enter a white or tan medium-sized car, and drive away quickly. One neighbor testified that when he looked from his window, he saw Zmetra lying in the driveway and phoned 911 for emergency assistance.

The defendant presented several alibi witnesses who described his activities on the night the shooting occurred. Nancy Griffin (Griffin) testified that on January 18, 1991, she arrived at the home of Joan Dyott and Joan Keegan (Keegan) between 4:30 and 5:30 p.m. and did not leave until Keegan arrived at about 8:45 p.m. She further testified that defendant was present the entire time she was there. Contrary to Griffin's testimony, Keegan testified that Griffin had left Keegan's home by the time she arrived. Keegan further testified that defendant had been at her home but left about five minutes after her arrival, at 8:45 p.m.

At the close of the state's case, defendant made a motion for a judgment of acquittal, on which the trial justice reserved judgment. On September 15, 1992, the jury returned guilty verdicts on both counts, and on September 22, defendant filed a motion for a new trial. On September 30, 1992, the trial justice denied both defendant's motion for judgment of acquittal and his motion for a new trial. Following his sentencing, on December 4, 1992, defendant filed this appeal, pursuant to G.L.1956 (1985 Reenactment) § 9–24–32.

### Motion for Judgment of Acquittal

■ In considering a motion for judgment of acquittal, a trial justice must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, in fact giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt. *State v. Mercado*, 635 A.2d 260, 263 (R.I.1993); *State v. Laperche*, 617 A.2d 1371, 1373 (R.I.1992). If the totality of the evidence so viewed and the inferences so drawn would justify a reasonable juror in finding a defendant guilty beyond a reasonable doubt, the motion for judgment of acquittal must be denied. *Laperche*, 617 A.2d at 1373; *State v. Grundy*,

582 A.2d 1166, 1170 (R.I.1990); *State v. Caruolo*, 524 A.2d 575, 581–82 (R.I.1987). In reviewing a trial justice's denial of such a motion, this Court applies the same standard as the tribunal below. *Mercado*, 635 A.2d at 263.

■ In the present case, defendant argued that the trial justice erred in denying his motion for judgment of acquittal because Snell's testimony was so "inherently unreliable" and "incredible" that, even if viewed in the light most favorable to the state, a rational juror could not find defendant guilty beyond a reasonable doubt. In denying defendant's motion, the trial justice gave the requisite full credit to Snell's detailed testimony concerning defendant's role in planning and executing the crimes against Zmetra, reviewed the testimony of the Carnation Street neighbors, considered the physical evidence, and concluded that there was ample evidence to permit a reasonable juror to find defendant guilty beyond a reasonable doubt on both counts.

Viewing the same evidence in the light most favorable to the state, we concur with the determination of the trial justice. Consequently, we hold that the trial justice properly denied defendant's motion for judgment of acquittal.

### Motion for a New Trial

■ In ruling on a motion for a new trial, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Banach*, 648 A.2d 1363, 1367 (R.I.1994) (citing *State v. Marini*, 638 A.2d 507, 515 (R.I.1994)). "Specifically, the trial justice has at least three analyses to perform when ruling on a motion for a new trial." *Id.* (citing *State v. Bertram*, 591 A.2d 14, 29 (R.I.1991). First, the trial justice must consider the evidence in light of the charge to the jury; second, the trial justice must determine his or her own opinion of the evidence; third, the trial justice must determine whether he or she would have reached a different result from that of the jury. *Id.* (citing *State v. Girouard*, 561 A.2d 882, 890–91 (R.I.1989)). In the instant case it is clear that the trial justice undertook and success-

fully completed each of the three steps set forth in *Banach. Id.* at 1367. If, after an independent review of the evidence, the trial justice makes the same determination as the jury, he or she should deny the motion for a new trial. *Id.* (citing *Marini,* 638 A.2d at 515–16). Whenever the trial justice has followed the requisite procedure and articulated a sufficient rationale for denying a motion for a new trial, the decision will not be disturbed unless the trial justice has "overlooked or misconceived material evidence relating to a critical issue or was otherwise clearly wrong." *Caruolo,* 524 A.2d at 585.

■ In the instant case, defendant contended that the trial justice overlooked or misconceived critical aspects of Snell's testimony. The defendant argued that the trial justice failed to consider the fact that Snell was the beneficiary of the "deal of the century" in exchange for his testimony against defendant. The trial justice, however, specifically mentioned that he was aware of the plea agreement and the leniency granted to Snell in exchange for his testimony at defendant's trial. Before ruling on defendant's motion for a new trial, the trial justice noted that Snell had given direct testimony concerning his plea agreement, and the justice stated, "I know, as did the jury, that he [Brian Snell] was the recipient of a rather lenient sentence, at least for his complicity in this case."

The defendant also claimed that the trial justice overlooked numerous inconsistencies in Snell's testimony, in particular those remarks concerning Snell's relationship with Zmetra and Snell's knowledge of guns. Yet our examination of the record indicated that the trial justice carefully considered the "inconsistencies" and "discrepancies" in those aspects of Snell's testimony. The trial justice found that the "significant part of his [Snell's] testimony," concerning the "salient point of [the] killing" of Zmetra, "absolutely rang true," and that "important aspects of his [Snell's] testimony" were corroborated by the testimony of independent witnesses, such as the Carnation Street neighbors, and by physical evidence, such as the recovered police scanner. Thus, our examination of the record has revealed that the trial justice

assessed the credibility of Snell with full awareness of Snell's plea agreement, that he considered the testimony of other witnesses, and that he weighed the physical evidence in light of the charge to the jury before finding that Snell was a credible witness on critical issues. Thus, it is clear that the trial justice independently considered the plea agreement and the inconsistencies in Snell's testimony in light of the charge to the jury and determined his own opinion of this evidence, consistent with the analyses required under *Banach. Banach,* 648 A.2d at 1367.

■ In addition, defendant argued that the trial justice overlooked or misconceived material evidence presented by defendant's alibi witnesses. Our scrutiny of the record has disclosed, however, that the trial justice properly assessed the credibility of the alibi witnesses but simply was not persuaded by their testimony. In determining the credibility of the testimony of the alibi witnesses, the trial justice found that there were "discrepancies in their testimony" and that the alibi witnesses had "their own credibility problems." On the basis of these findings, the trial justice concluded that he could not "at all fault the jury's decision" to reject the alibi defense. The trial justice's independent consideration of the credibility of the alibi witnesses in light of the charge to the jury and his determination that he would reach the same conclusion as that of the jury demonstrates that the trial justice undertook and successfully completed each of the three steps set forth in the *Banach* analysis. *Id.* at 1367.

Moreover, the trial justice independently assessed the credibility of the witnesses and weighed the evidence, thereby fulfilling his role as the thirteenth juror. Because his independent review of the evidence led him to the same determination as that of the jury, the trial justice correctly denied the motion for a new trial and affirmed the verdict. It is the conclusion of this Court that the trial justice considered and understood all material evidence, and therefore we hold that defendant's motion for a new trial was properly denied.

## Questioning of Defense Witness Keegan

The defendant claimed that the prosecutor asked highly prejudicial questions of defense witness Keegan that were inadmissible as evidence of bad acts under Rule 404(b) of the Rhode Island Rules of Evidence [1] and that disclosed irrelevant evidence of the witness's sexual preference. Specifically, defendant contended that the trial justice erred in refusing to strike the following question to Keegan by the prosecutor: "Did Susan Texeira at that time also tell you that Jimmy Snow had a series of court appearances in Worcester court which related to * * * this Rhode Island arrest?"

■ As a general rule, evidence of past, unconnected, uncharged criminal behavior is not admissible, in the prosecution of a specific crime, to prove a defendant's propensity to commit the crime charged. *State v. Woodson*, 551 A.2d 1187, 1193 (R.I.1988). Rule 404(b) excludes "other-acts evidence that suggests an accused's bad character because 'the potential for creating prejudice in the minds of the jurors outweighs its probative value.'" *State v. Brown*, 626 A.2d 228, 233 (R.I.1993) (quoting *State v. Chartier*, 619 A.2d 1119, 1122 (R.I.1993)).

■ It is our conclusion, however, that the question by the prosecutor in this case did not implicate Rule 404(b) because it did not relate to past criminal conduct but, rather, involved court appearances in Massachusetts relating to the instant charges. Moreover, an examination of the record persuades us that the question was merely one of several properly asked in order to impeach Keegan's alibi testimony. After Keegan testified that defendant was at her home when Zmetra was murdered in January 1991, the prosecutor asked her whether she knew where the Boston police department was located, whether she knew that charges had been instituted against defendant in Rhode Island, and whether she knew that defendant would be appearing in a Worcester court in relation to his arrest on the Rhode Island charges. Once Keegan answered these questions in the affirmative, the prosecutor then asked whether she had ever informed any law enforcement officials in Rhode Island or Massachusetts that she was with defendant on the night the crimes against Zmetra were supposedly committed. Keegan replied that she had not. We are persuaded by the state's argument that the question was posed to demonstrate that Keegan's alibi testimony was fabricated because a reasonable person would have informed law enforcement officials once she realized that she could provide an alibi for an acquaintance arrested for a crime. Therefore, because the evidence in question was not admitted to prove defendant's bad character or to show that he acted in conformity therewith on the night of the murder, it is clear that the evidence was properly admitted.

■ The defendant next contended that the prosecutor's questions concerning Keegan's lifestyle and sexual preference were irrelevant and highly prejudicial, although he conceded that the issue was not preserved for appeal because he raised no objection to these questions at trial. It is well settled that this Court will not review issues that were not preserved by a specific objection at trial. *State v. Toole*, 640 A.2d 965, 972–73 (R.I.1994); *State v. Burke*, 529 A.2d 621, 627 (R.I.1987).

■ Even were this Court to consider defendant's claim, we would nevertheless conclude that it is without merit. To impeach the credibility of defendant's alibi witnesses, the prosecutor elicited testimony concerning their relationships with each other, as well as with defendant and his family, in an effort to demonstrate the bias of the witness and to offer support for the state's theory that the witnesses had fabricated an alibi for defendant. This Court has stated that a "cross-examiner must be given a reasonable opportunity to explore and to estab-

---

1. Rule 404(b) of the Rhode Island Rules of Evidence provides: *"Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

lish any possible bias, prejudice, or ulterior motive that a witness may possess that might affect the witness' testimony." *State v. Veluzat*, 578 A.2d 93, 94–95 (R.I.1990). In the instant case, we are satisfied that the purpose of the questioning was to place before the jury the witness's possible biases and motives in providing defendant with an alibi.

### Motion to Dismiss

██ Last, defendant challenged the denial of his motion to dismiss on the basis of improper extradition. He argued that the Massachusetts rendition warrant was defective as a matter of law because the indictment and other documents used to execute his interstate rendition failed to establish probable cause. The defendant was entitled to challenge the extradition warrant by filing a state writ of habeas corpus in Massachusetts. An unfavorable decision in the Massachusetts Superior Court could then be challenged in the Supreme Judicial Court of Massachusetts. If defendant were then denied relief in the Massachusetts courts, he would have been entitled to file a federal habeas corpus petition.

██ In any event, the defendant's claim of improper extradition was not properly presented to the Rhode Island Superior Court by way of a motion to dismiss and is not properly before this Court on appeal. Consequently, we hold that the trial justice properly denied the defendant's motion to dismiss.

For the reasons herein stated, the defendant's appeal is denied and dismissed and the judgment of conviction is affirmed. The papers in this case are remanded to the Superior Court.