STATE

v.

Jesus CONTRERAS–CRUZ.

No. 98–533–C.A.

Supreme Court of Rhode Island.

Jan. 30, 2001.

___

Aaron L. Weisman, Providence, Jennifer S. Sternick, Newport News, VA, for Plaintiff.

Paula Rosin, Providence, for Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, and FLANDERS, JJ.

## OPINION

LEDERBERG, Justice.

This case came before the Supreme Court on the appeal of Jesus Contreras–Cruz (defendant) from judgments of conviction on counts of burglary and first-degree sexual assault. One of the issues we address in this case is whether a defendant who may have permission to enter a home can be convicted of burglary after he, without permission, broke and entered a private room within the house. For the reasons set forth below, we deny the appeal and affirm the conviction in all respects.

### Facts and Procedural History

At the time the events in this case occurred, the victim, whom we shall call Tess, was living with her boyfriend, Paul Contreras (Eddie), his mother, two of his brothers, and the girlfriend of one of the brothers, at a house on Ames Street in Coventry, Rhode Island (premises or house), where she and Eddie occupied a bedroom on the first floor. The defendant did not reside at the house. On the night of October 23, 1993, Tess, Eddie, and several friends, including defendant (who is Eddie's half-brother), met at the house and then went to a football game. Tess testified that she started drinking liquor at the football game and later returned to the house and continued drinking. The group soon ventured to a fast-food restaurant, where Tess felt sick and started vomiting. According to Tess, after leaving the restaurant, she, Eddie, and defendant drove to a party at the home of Eddie's cousin. Because Tess continued to vomit on the way, she remained in the car when the group arrived at the party.[1] Tess stated that while she was in the car, defendant came out of the house and spoke with her, telling her that if Eddie cared for her, he would be out in the car with her and not in the house. Tess testified that she was

---

1. Eddie testified on cross-examination that Tess went inside the house once to use the bathroom, and Tess testified that "Eddie had carried me in to go to the bathroom."

vomiting while defendant spoke to her, that she told Eddie about defendant's speaking with her, and that Eddie then drove her home and put her to bed.

According to Tess's testimony, she next remembered being in her bed with someone on top of her, engaging in intercourse with her. She stated that the lights were off and she "woke up" to a banging on the door, heard Eddie calling her name, and realized then that it was not Eddie who was with her in bed. When the door opened, she saw that it was defendant with her, at which point defendant "jumped through the window." Tess testified that she had not let defendant into her room or into the house and did not consent to his acts.

Eddie's testimony confirmed that of Tess, who he reported drank a large quantity of St. Ides Malt Liquor and Southern Comfort whiskey throughout the night before the time she began vomiting. Eddie also testified that while Tess remained outside in the car during the party, he checked on her periodically. He further testified that defendant approached him at the party and asked if he could take the car to a car wash. Eddie indicated that defendant could do so if accompanied by two other friends but defendant declined, apparently only wanting to go if he were alone in the car with Tess. The two friends and Tess did drive to the car wash, though it is unclear from the record whether defendant went also. Eddie acknowledged that when he later took Tess home, she was "more to the unconscious side" and that when he carried her inside, "she was unconscious, basically" and could not walk.[2] Eddie testified that he put Tess to bed, turned off the lights, closed the door, left and returned to the party.

Eddie testified that he spoke with defendant upon returning to the party, after which defendant told Eddie that he was leaving to go to a bar and he would meet Eddie back at the Ames Street house later. Eddie testified that he offered to go with defendant, but that defendant indicated that he wanted to be alone. Eddie specifically recalled that defendant said he would be waiting outside the house.

Eddie testified that he left to return home because "things were bothering" him, and he was concerned about Tess. Upon arriving, defendant was not waiting outside or in the living room. Eddie made his way to the bedroom and found that the door was bolted from the inside, whereupon he kicked the door open. At that point, he saw defendant's face, and Tess began to scream. The defendant jumped at the door to shut it as Eddie tried to force the door open with his shoulder, to no avail. Eddie then grabbed a kitchen knife and began to thrust the knife through the top portion of the door. He stated that he then heard a shattering sound, "like somebody * * * jumping through the window." Eddie testified that he chased defendant but did not catch him.

A witness testified that she, too, was at the party that evening, and as she was leaving, defendant entered her car and told her he wanted to go to a bar. She stated that he then directed her to the house on Ames Street, and when they arrived there, defendant left the car and walked toward the house. Additional facts will be added as necessary in the legal analysis.

Following the presentation of the state's case, defendant moved for a judgment of acquittal. The trial justice denied the motion on both counts of the indictment. Before defendant's case was presented, defense counsel moved to dismiss the sexual assault charges on the grounds that the statute, G.L.1956 § 11–37–2(1), was unconstitutional. The trial justice denied this motion also. After his case was argued, defendant again moved for a judgment of

---

2. A witness testified that he saw Eddie bringing Tess back to the Ames Street house that night and that she was "[t]otally unconscious, extremely intoxicated. You know, beyond the point of consciousness."

acquittal, at which point the trial justice denied the motion with respect to the sexual assault count and reserved ruling on the burglary count until after the jury's verdict. The jury returned a verdict of guilty on both the first-degree sexual assault charge and the burglary charge, and the trial justice denied the motion for judgment of acquittal on the burglary count. After his motion for a new trial was denied, defendant was sentenced to forty years, with fifteen years to serve and twenty-five years suspended on each of the sexual assault and burglary convictions, both sentences to be served concurrently. This appeal followed.

In his appeal, defendant argued that the trial justice erred in denying his motion for judgment of acquittal on the burglary charge because entering Tess's bedroom was not equivalent to entering a dwelling, the prosecution failed to present legally sufficient evidence to establish beyond a reasonable doubt that defendant entered the victim's home with the intent to sexually assault her, and he had permission to enter the home; second, hearsay testimony was admitted to establish that defendant did not have permission to enter the premises at the time of the crime, and it was prejudicial bad character evidence that showed he was a "bad guy;" third, it was error to deny defendant's motions for judgment of acquittal and new trial on the charge of first-degree sexual assault of a "physically helpless" person because among other reasons Tess's testimony on cross-examination showed that she was not "physically helpless;" and fourth, by restricting the cross-examination of Tess, defendant was precluded from establishing that the intercourse was consensual.

## Judgment of Acquittal on the Burglary Charge

■ The defendant argued on appeal that the trial justice erred in denying his motion for judgment of acquittal on the burglary charge. Specifically, defendant argued that the prosecution failed to present legally sufficient evidence to establish

beyond a reasonable doubt that he entered Tess's dwelling place with the intent of sexually assaulting her. The defendant claimed that the "best" that could be inferred from the evidence presented is that he connived to be alone with Tess to seduce her, and any inference of a felonious intent was impermissibly speculative. We disagree with both arguments.

■ "In considering a motion for judgment of acquittal, a trial justice must view the evidence in the light most favorable to the state, without weighing the evidence or assessing the credibility of the witnesses, in fact giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt.* * * If the totality of the evidence so viewed and the inferences so drawn would justify a reasonable juror in finding a defendant guilty beyond a reasonable doubt, the motion for judgment of acquittal must be denied. * * * In reviewing a trial justice's denial of such a motion, this Court applies the same standard as the tribunal below." State v. Snow, 670 A.2d 239, 243 (R.I.1996).

■ The defendant was indicted on the crime of burglary in violation of G.L.1956 § 11–8–1, which incorporates the common law definition of the crime. State v. O'Rourke, 121 R.I. 434, 436, 399 A.2d 1237, 1238 (1979). "Burglary at common law is the breaking and entering the dwelling-house of another in the nighttime with the intent to commit a felony therein, whether the felony be actually committed or not." State v. Hudson, 53 R.I. 229, 230, 165 A. 649, 650 (1933). See also State v. Ranieri, 586 A.2d 1094, 1103 (R.I.1991); O'Rourke, 121 R.I. at 436, 399 A.2d at 1238. In applying this definition to the facts of this case, the evidence is clear that defendant had been with Tess during the night and had witnessed her extremely intoxicated condition. Yet, he schemed to be alone with her. Virtually unconscious, Tess had been carried to bed by Eddie, who turned off the lights and closed the bedroom door.

There is no evidence that defendant asked permission to enter Tess's room, or knocked on the door, or attempted to wake her. Rather, the record reflects that Tess in no way gave her consent to entry, but woke to find defendant having sexual intercourse with her.

Eddie testified that the next day, defendant called Eddie and insisted that he was not at the house the previous night, and in a later conversation, defendant told Eddie that he was sorry for raping the victim. *See State v. Lamoureux,* 573 A.2d 1176, 1181 (R.I.1990) ("It is reasonably obvious that intent may only be determined in the ordinary course of events by the subsequent actions of the accused."). Our review of the record persuades us that although reasonable minds could differ, a reasonable juror might infer from the evidence that defendant entered the bedroom late that night intending to take advantage of Tess's helpless state to engage in intercourse with her, regardless of her consent.

The defendant countered that Tess was conscious outside the party that night because "she not only conversed with [defendant] but subsequently recalled their conversation."[3] He further pointed out that Tess "remembered going to the car wash at one point" and even recalled what kind of car wash they used. He noted that Eddie testified that the victim "got out of the car and went into [the] house [in which the party was held] to use the bathroom"[4] and that Eddie "admitted that he asked [the victim] if she wanted to go home and she said no, she was all right and wanted to stay." After careful review of the transcript describing these events, we are of the opinion that none of the evidence is inconsistent with Tess being extremely intoxicated while defendant was aware of

that fact and was intent on sexually assaulting her when he entered the house and the bedroom.

We are not persuaded that "enough time had passed since she was sick to negate any inference that [defendant] would have believed she was feeling the full effects of the alcohol when he went into the house," as defendant contended, given that there is no evidence of how much time elapsed before he entered her bedroom.

The defendant cited the cases of *State v. Moran,* 699 A.2d 20 (R.I.1997); *State v. Williams,* 461 A.2d 385 (R.I.1983), and *State v. Woods,* 63 Wash.App. 588, 821 P.2d 1235 (1991) to support his position that the evidence of intent here was too weak or equivocal to support a conviction. In *Williams,* we held that the trial justice erred in denying the defendant's motion for judgment of acquittal on the charge of receiving stolen property—a ring—because there was "no evidence" to show that the defendant knew at the time he received it that the ring had been stolen. *Williams,* 461 A.2d at 388. The distinction between that case and the case at bar is that in *Williams* at most the evidence might have shown "a strong suspicion" that *after* defendant received the ring, he learned from a qualified appraiser that the ring in his possession was worth a considerable amount of money. Here, however, there is sufficient evidence that defendant already had the requisite mental state at the critical time of breaking and entering. Moreover, the evidence of the defendants' guilt in *Moran* and *Woods* was not as compelling as was the evidence in this case.

Finally, defendant alleged that a finding of guilt would constitute an impermissible pyramiding of inferences, citing *State v.*

**3.** Testimony on this issue at trial revealed the following:

"Q: Now, what happened when you were in the car outside of [the party]? * * *
"[Tess]: [Defendant] had come out and started saying things to me about Eddie.
"Q: What did he say, if you recall?

"[Tess]: That if Eddie cared about you, he'd be out here with you right now and not in there, and that was basically about it.
"Q: Do you recall responding to that?
"[Tess]: I was just throwing up."

**4.** Tess, however, testified that "Eddie had carried me in to go to the bathroom."

*Dame,* 560 A.2d 330, 334 (R.I.1989); *In re Derek,* 448 A.2d 765, 768 (R.I.1982), and *State v. Alexander,* 471 A.2d 216, 218 (R.I. 1984). In this case, however, there was no "pyramid." Rather, felonious intent could be inferred from facts that were unambiguous and capable of providing proof of defendant's guilt beyond a reasonable doubt.

### Permission to Enter the Dwelling

■ The defendant next claimed that he did not violate the scope of his permission to enter the house and that he could not be convicted of breaking and entering because Tess's room was not a "dwelling house," the entry of which could support a burglary conviction. Therefore, he argued, the trial justice erred in not granting defendant's motion for judgment of acquittal. The circumstances of this case support defendant's conviction of burglary,[5] notwithstanding his assertion that at common law, consent to enter the dwelling was a complete defense to a burglary prosecution. Judy E. Zelin, Annotation, *Maintainability of Burglary Charge, Where Entry into Building is Made with Consent,* 58 A.L.R.4th 335 (1987).

■ It has long been held that while one may have permission to enter parts of a dwelling, entry into a room within that dwelling that a person does not have permission to enter can constitute burglary. *See United States v. Bowen,* 24 F.Cas. 1207 (D.C.Cir.1835) (No. 14, 629) (holding that though slave was lawfully in the house, he could be convicted for burglary if he entered into his mistress's room with intent to kill her); 1 Hale, *The History of the Pleas of the Crown,* 554 (London 1736) (discussing that a servant who sleeps in one part of the house and his master in another, and who unlatches the door of his master's chamber and enters with intent to kill the master, may be convicted of burglary; also if a lodger at an inn opens the chamber door of another lodger at the inn to steal his goods, the intruder may be convicted of burglary).[6] Moreover, several courts have held that a room within a house can constitute a "dwelling house" for the purposes of a burglary prosecution. *See, e.g., State v. Descant,* 117 La. 1016, 42 So. 486, 488 (1906) ("different rooms of a house with doors and entry common to all, constitutes each room the 'dwelling house' of the particular occupants; * * * therefore, an illegal entry into part of the house may be made by one who has a right to be in another part"); *Monks v. Dykes,* 4 M. & W. 566, 569, 150 Eng. Rep. 1546, 1547 (1839) (stating that room in a house may or may not be a dwelling house, depending on circumstances).

In a similar application of the common law, this Court has held that a dormitory room was an "apartment" within the meaning of § 11-8-3. *State v. Riely,* 523 A.2d 1225 (R.I.1987). We explained the policy

---

**5.** The trial justice charged the jury, in relevant part, as follows:

"The opening of a closed door inside a dwelling house or apartment to which that permission, whether express or implied or limited or conditional or not, to which the permission doesn't apply, will be a breaking. * * * The State must prove that once having opened something that was closed which the defendant did not have permission to open, he came through that opening thereby entering into the closed off or protected area or portion of the dwelling house or the dwelling house itself. * * * Third, the State must prove beyond a reasonable doubt that the dwelling into which the defendant broke and entered was a dwelling house or a part of the dwelling house * * * of another person."

**6.** Professors LaFave and Scott have written that "[i]f several people occupy the same dwelling, none may commit a burglary thereto as it is not the property of another. However, if a portion of the structure has been set aside for one resident, as in letting an apartment, any of the others (including the owner) could commit a burglary into that portion of the dwelling," and cited common law sources 2 E. East, *Pleas of the Crown,* 484, 504 (1803) and 1 W. Hawkins, *Pleas of the Crown,* 160, 163 (1787). Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 8.13, at 470–71 (1986).

behind considering such a room an "apartment":

> "Professor Perkins has emphasized that the terms 'dwelling' or 'dwelling house' import a human habitation or a place of abode used as a 'place to sleep in.' He also has pointed out that there may be more than one dwelling or dwelling house under the same roof, referring to apartment houses and other similar structures. R. Perkins & R. Boyce, *Criminal Law*, at 255–59 (3d ed.1982). * * * In our opinion, § 11–8–3 attempts to afford some degree of security to one's abode whether the occupant resides in an apartment or a dormitory room because both units are to be found in multiple dwelling structures that provide the occupant with sleeping accommodations and other facilities * * *." *Riely*, 523 A.2d at 1226.

More recently, in *State v. Turner*, 746 A.2d 700, 703 (R.I.2000) (per curiam) we held that a private apartment of an on-site manager within a bed-and-breakfast was a "dwelling house" within the meaning of § 11–8–2(a). We noted that "only the manager and her husband had access to the door through which the defendant entered—a private entrance, separate and apart from the building's front entrance."[7]

Here, Tess and Eddie shared the bedroom in the context of an intimate relationship. The bedroom door had a lock on the knob and an additional dead-bolt lock, clearly rendering the room deserving of the same level of security and protection as that afforded to a dormitory room or a private apartment within a bed-and-breakfast. Accordingly, we hold that the victim's bedroom was a "dwelling" within the meaning of the law of burglary. Moreover, the trial justice was correct in stating that "the law of burglary protects not only the dwelling house generally, but the private quarters or apartments of each person who lives within the dwelling house."

Although testimony that defendant told Eddie that he would wait for him outside the Ames Street house could lead to the conclusion that defendant was not permitted to enter the home at that time, the record is silent on details such as whether other members of the household were present or awake when defendant entered. But even assuming that defendant had permission to enter the house, the evidence clearly demonstrated that defendant had no permission to enter the bedroom but instead entered Tess's room with the intent to commit a felony therein. Therefore, the trial justice did not err in denying the motion for judgment of acquittal.

## Hearsay

Next, defendant contended that the trial justice erred in permitting hearsay testimony to establish that he did not have permission to enter the premises at the time of the crime, hearsay that was prejudicial in showing that defendant was a "bad guy." The testimony at issue was given by Eddie, who was a witness for the state.

> "Q: Can you tell us if [defendant] was welcome at the house?
>
> "[Defense counsel]: Objection, your Honor.
>
> "The Court: Overruled.
>
> "A: He was welcome, but my mother didn't want him around.
>
> "[Defense counsel]: Objection. Move to strike, with a cautionary.
>
> "The Court: Overruled. And, the motion is denied. You may proceed.

---

7. The defendant noted that this Court held in *State v. Neary*, 122 R.I. 26, 404 A.2d 65 (1979) that the term "apartment" did not fall within the meaning of the term "dwelling house" in G.L.1956 § 11–8–3 as it then existed and that therefore the defendant in that case, who was accused of "enter[ing] an apartment intending to commit larceny," could not be convicted under that statute which only prohibited burglary of a "dwelling house." However, defendant here was charged with common law burglary pursuant to § 11–8–1, and *Neary* involved interpretation of § 11–8–3 in light of the legislative history of that section. Thus, the *Neary* analysis is not relevant here.

"A: He was welcome, but my mother didn't want him around when she was alone or—you know. She wanted the kids around her basically."

It is our opinion that this testimony addressed Eddie's mother's state of mind in respect to whether defendant had permission to be on the premises. Consequently, it fell within the *"Then Existing Mental, Emotional, or Physical Condition"* exception to the hearsay rule, pursuant to which a statement is not excluded even though the declarant is available as a witness if it is

"[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed * * *." R.I. R. Evid. 803(3).

Eddie described his mother's "state of mind" concerning the scope of defendant's permission to enter the house, and thus its admission was not error. The statement was not "highly prejudicial" as an implication that defendant was a "bad guy," as defendant contended, because ample other evidence was presented on which a reasonable juror could otherwise draw such a conclusion. Moreover, Rule 404(a) of the Rhode Island Rules of Evidence states that "[e]vidence of a person's character or a trait of the person's character is not admissible *for the purpose of proving that he or she acted in conformity therewith on a particular occasion * * *."* (Emphasis added.) Here, testimony was not offered for impermissible purposes, but rather to indicate the scope of defendant's permission to enter into the house.

### Sexual Assault

■ The defendant offered several arguments to support the proposition that the trial justice erred by not granting defendant's motion for judgment of acquittal and his motion for a new trial on the sexual assault count. He maintained that Tess's testimony on cross-examination showed that she was not "physically helpless" at the time of penetration, but was fully aware of events and consented to sexual intercourse in the mistaken belief that defendant was her boyfriend. He also argued that the evidence on Tess's state of consciousness was too ambiguous to constitute proof beyond a reasonable doubt. Next, he argued that the prosecution failed to prove beyond a reasonable doubt that defendant "knew or should have known" that Tess was "physically helpless." Finally, defendant claimed that even if one could conclude beyond a reasonable doubt that at the moment of penetration Tess was asleep, "[Tess's] subsequent, admitted consent to continue in the sex act upon awakening and believing her boyfriend had penetrated her, vitiated the crime of sexual assault of a physically helpless person and turned this into the crime of sexual assault by concealment, a crime with which [defendant] was *not* charged." We disagree. With respect to defendant's motion for judgment of acquittal on the sexual assault charge, we noted *ante* that the trial justice must view evidence in a light most favorable to the state, giving credibility to the state's witnesses, drawing all reasonable inferences consistent with guilt, and viewing whether a reasonable juror could find a defendant guilty beyond a reasonable doubt. *Snow,* 670 A.2d at 243.

With respect to defendant's new trial motion, we have long held that

"the trial justice must exercise independent judgment in determining whether the evidence adduced at trial is sufficient for the jury to conclude guilt beyond a reasonable doubt. * * * This court will reverse a trial justice's ruling on a motion for a new trial only if we find that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." *State v. Scurry,* 636 A.2d 719, 725 (R.I.1994).

" 'Specifically, the trial justice has at least three analyses to perform when

ruling on a motion for a new trial.' * * * First, the trial justice must consider the evidence in light of the charge to the jury; second, the trial justice must determine his or her own opinion of the evidence; third, the trial justice must determine whether he or she would have reached a different result from that of the jury." *Snow,* 670 A.2d at 243.

Here, the state charged defendant with "engag[ing] in sexual penetration, to wit, sexual intercourse with [the victim], knowing [the victim] was physically helpless, in violation of § 11–37–2 and § 11–37–3." Section 11–37–2(1) states that:

"[a] person is guilty of first degree sexual assault if he or she engages in sexual penetration with another person, and if any of the following circumstances exist:

(1) The accused, not being the spouse, knows or had reason to know that the victim is mentally incapacitated, mentally disabled, or physically helpless."

One who is "physically helpless" is defined in § 11–37–1(6) as "a person who is unconscious, asleep, or for any other reason is physically unable to communicate unwillingness to an act."

The trial justice in this case made the following statements in denying the motion for a new trial.

"I've reviewed the transcript of the cross examination of the victim here. I've rehearsed it in my mind and I have reflected very carefully on the demeanor of the witness while testifying. * * * I am satisfied that the witness was trying to convey that at the time of initial penetration she was not aware of what was going on. * * * [T]he jury was fully justified in concluding beyond a reasonable doubt that at the moment the crime of sexual penetration was complete, that is, when there was the slightest degree of penetration, the victim, * * * was * * * so far within the realm of sleep that she was unable to communicate her unwillingness to have been * * * penetrated."

Having also reviewed the transcript of Tess's testimony, we conclude that the trial justice did not overlook or misconceive material evidence. Moreover, the trial justice's analysis made clear that Tess's state of mind at the time was a question of fact on which the jury could find that Tess was asleep and thus physically helpless during the penetration. Therefore, the trial justice correctly denied defendant's motions for judgment of acquittal and a new trial.

### Restriction of Cross Examination

The defendant also maintained that the trial justice erred in restricting his cross-examination of Tess that was designed to establish that the intercourse was consensual. Specifically, defendant contended that the trial justice erred by precluding defense counsel from questioning Tess about her boyfriend's affair with another woman, a circumstance that might serve to establish that Tess consented to have intercourse with defendant for revenge.

"Limiting the extent and scope of cross-examination is within the sound discretion of the trial justice, and any such ruling by a trial justice will be left undisturbed by this Court absent a showing of a clear abuse of that discretion." *State v. Veluzat,* 578 A.2d 93, 95 (R.I.1990). The trial justice here did not abuse his discretion under the circumstances of this case that disclosed Tess was too intoxicated at the time to formulate and carry out a retaliatory scheme.

We have considered other issues raised by defendant and consider them to be without merit.

In summary, therefore, we deny and dismiss the appeal and affirm the judgment of the Superior Court, to which we return the papers in the case.

Justice GOLDBERG did not participate.