Filed 3/26/14 (unmodified opinion attached)

CERTIFIED FOR PARTIAL PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062659 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN291820) |
| HUGO GARCIA, | ORDER MODIFYING OPINION |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT

It is ordered that the opinion filed herein on March 24, 2014 be modified as follows:

Replace the starred footnote on the first page of the opinion with the following footnote:

\*       Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts IB., II, III, IV and V of the Discussion.

This modification does not change the judgment.

BENKE, Acting P. J.

Copies to:  All parties

Filed 3/24/14 (unmodified opinion)

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>HUGO GARCIA,<br><br>　　　Defendant and Appellant. | D062659<br><br><br>(Super. Ct. No. SCN291820) |

APPEAL from a judgment of the Superior Court of San Diego County, Daniel B. Goldstein, Judge. Affirmed as modified.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]　　Pursuant to California Rules of Court, rule 8.1110, only part I-A. of the Discussion is certified for publication.

A jury convicted defendant and appellant Hugo Garcia of burglary (Pen. Code, § 459; counts 1 & 4); robbery (Pen. Code, § 211; count 2); kidnapping with intent to commit rape (Pen. Code, § 209, subd. (b)(1); count 3); forcible rape (Pen. Code, § 261, subd. (a)(2); count 5); rape by a foreign object (Pen. Code, § 289, subd. (a); count 6); unlawful taking or driving of a vehicle (Veh. Code, § 10851, subd. (a); count 7); and attempted robbery (Pen. Code, §§ 664 & 211; counts 8 & 9). As to counts 2, 3, 8 and 9, the jury found true Garcia personally used a firearm during the commission of the offenses. (Pen. Code, § 12022.53, subd. (b).) As to counts 5 and 6, the jury also found true that Garcia kidnapped the victim with the movement substantially increasing the risk of harm to the victim (Pen. Code, § 667.61, subd. (d)(2)), committed the offenses during the commission of a burglary (Pen. Code, § 667.61, subd. (e)(2)), engaged in the tying or binding of the victim (Pen. Code, § 667.61, subd. (e)(5)) and personally used a firearm (Pen. Code, § 667.61, subd. (e)(3)).[1] The court sentenced Garcia to prison for an aggregate term of 74 years four months to life.

On appeal, Garcia contends (1) the evidence is insufficient to support his conviction on counts 4, 8 and 9; (2) the court had a sua sponte duty to modify the jury instruction on count 6, forcible penetration by foreign object, to exclude a penis from the definition of a foreign or an unknown object; (3) the trial court erred in imposing consecutive sentences on counts 5 and 6 and in not staying under section 654, subdivision

---

[1] The jury found Garcia not guilty of burglary (Pen. Code, § 459; count 10) and of grand theft of a firearm (Pen. Code, § 487, subd. (d)(2); count 11). All further statutory references are to the Penal Code unless otherwise indicated.

(a), his sentence on count 4, burglary with the requisite felonious intent to commit sexual assault; (4) the $10,000 restitution imposed on him pursuant to section 1202.4, subdivision (b)(1) must be reversed because the facts on which it was based were not submitted to the jury for determination beyond a reasonable doubt; and finally (5) the abstract of judgment must be corrected to reflect accurately the oral pronouncement of judgment.

As we explain, we agree with Garcia's contention his sentence under count 4 should have been stayed. We also agree—as do the People—that his abstract of judgment must be corrected to state accurately the oral pronouncement of judgment and the modification of the judgment as discussed in this opinion. In all other respects, we affirm the judgment of conviction.

FACTUAL AND PROCEDURAL BACKGROUND[2]

A. *Offenses against M.*

Victim M. in May 2011 was working at a store located in Escondido, California providing services for low income families and women who are pregnant, breastfeeding or just had a baby (store). M. saw a young man later identified as Garcia riding his bicycle slowly in front of, and looking into, the store. After G.C., a fellow employee of M., left for the day, the man entered the store, looked around and then smiled at M. and left. Shortly thereafter, the man reentered the store, went to the counter near where M.

---

[2] We view the evidence in the light most favorable to the judgment of conviction. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Portions of the factual and procedural history related to the contentions raised by Garcia are discussed *post*.

was standing and started asking M. what she described were "weird" questions about the store's voucher program. The man held a cell phone in one hand, and his other hand was inside his jacket pocket. M. became concerned by the man's behavior. M. used her cell phone to message G.C. that there was a man inside the store asking "weird" questions and that she was scared. G.C. called back on the store phone, but M. could not speak candidly with G.C. because the man was standing nearby. M. thus hung up the phone.

The man next asked M. about a jar of candies located on the counter. As M. was opening the jar to give the man some candy, he pulled a gun out of his jacket pocket, pointed it at M. and ordered her to hand over the money from the cash register. M. complied and told the man not to hurt her. M. put the money in a bag. While still pointing the gun at M., the man asked M. if she had any money. M. next pulled a few dollars from her pants pocket and also put it into the bag.

The man directed M. to close the front door of the store and followed behind her with the gun pointed at her back as she walked to the door. The man then made M. remove the "open" sign hanging by the door and turn off the store lights.

M. asked the man to leave. Instead, the man pointed the gun at M. as they began walking toward the back of the store. They stopped near some refrigerators, and he asked M. if she had the key to the office door, which was closed and locked. She said no. He then asked M. if the store had a bathroom. M. said yes, but she refused to go down the hallway into the bathroom, which was located behind the office in the very back of the store, out of sight from the main part of the store. M. next got on her knees and begged

4

the man not to harm her, telling him she had a daughter waiting for her at home. The man in response told M. to remove her clothes. M. again asked the man not to harm her, but he waved the gun back and forth at her, a gesture she understood to mean for her to go to the bathroom and take off her clothes. Scared, M. went into the bathroom and removed her pants and blouse.

While still pointing the gun at M., the man entered the bathroom and demanded that she remove her underwear and bra. She complied. He next made M. turn and face him inside the bathroom. He left the bathroom and returned a short time later with some "hair bands" sold by the store that M. described as bands a little girl might put around her entire head to keep the hair out of her face. The man tried to use the hair bands to tie up M.'s hands but, because he was still holding the gun and kept it near M.'s chest area, she offered to tie up her own hands so he did not "accidently" shoot her. The man left the bathroom again and returned holding more hair bands. The man asked M. to tie up her feet but, because she was shaking, she could not do so and ended up breaking the bands. As she was attempting to tie up her feet, the man again left the bathroom.

When the man returned yet again to the bathroom, his fly was open and his erect penis was exposed. The man made M. turn around and face the mirror in the bathroom so that her back was to him. While still pointing the gun at M., he digitally penetrated, and then put his penis inside, her vagina. The man also touched her breasts and put his hands on the back of M's neck and pushed her head down. When M. began to cry, the

5

man gestured for her to be quiet. After the sexual assault, M. felt "wet" in her vaginal area. She saw the man wipe himself with a paper towel or napkin and throw it away.

The man told M. to stay put. After he left the bathroom, M. struggled to get dressed. The man returned to the bathroom and then left. M. walked out of the bathroom, toward the main part of the store, where she saw the man opening and looking in some drawers. He ordered M. back into the bathroom and eventually closed the bathroom door with her inside. M. sat on the bathroom floor for a short while. When she could no longer hear anyone inside the store, M. came out of the bathroom and found the store empty. She walked outside, heard a car start and saw the man drive off in her white SUV. M. went to a nearby business for help. An employee of the business called police.

B. *Offenses against S. & Y.*

That same day, about 9:15 p.m., S. and Y. closed an Escondido check-cashing store (check-cashing store) where they were working, left through the front door and headed towards the back parking lot. S. testified it was a "really slow day" and, thus, they closed the check-cashing store about 15 to 25 minutes earlier than normal.

As they walked to their cars, they saw a white SUV parked nearby and a man later identified as Garcia standing next to the SUV, with his back turned. As they continued walking toward their cars, the man turned around and began walking towards S. and Y. He then told them in broken English to stop and demanded they reopen the check-cashing store. S. and Y. pretended not to hear the man but, as they got closer and he repeated to them, "you got to stop," they saw the man was holding a gun. The man was waving the

6

gun in the direction of the door of the check-cashing store, telling them to open the door and not be "stupid."

S. and Y. started walking backwards as the man continued to walk towards them, gesturing with the gun and demanding they open the check-cashing store. As S. and Y. got closer to a nearby gas station, the light from the station illuminated the man's face. S. and Y. then turned, ran to the gas station and called police. The man drove off in a white SUV. They gave police a description of the man and his vehicle. As discussed *post*, they went to the police station a short time later, after the man had been apprehended, and identified Garcia as the man that had pointed the gun at them.

Law enforcement arrested Garcia in Escondido about 9:30 p.m. that same night as he stood in front of the white SUV while it was parked in front of a laundromat, which was located near the check-cashing store. Law enforcement found a .22-caliber revolver in Garcia's front pocket. There were four bullets in the gun's chamber, including one behind the hammer so that the gun would fire if the trigger was pulled.

Police went to the store where M. had been sexually assaulted and found four hair ties in the bathroom in the back of the store, two of which were torn and/or broken. Police also found an open package of hair ties on a shelf located in the main area of the store.

Inside M.'s SUV, police found a sports drink bottle. After his arrest, police found in Garcia's backpack a roll of clear packing tape, a pair of scissors and several bills in different denominations.

7

Samples taken from inside M.'s vagina showed the presence of sperm. These samples and the samples taken from the sports drink bottle found inside M.'s SUV matched the DNA profile of Garcia.

In his statement to police that was played for the jury, Garcia admitted to the robbery of, and the rape of M., at the store. Garcia also admitted he stole M.'s SUV. However, he denied the attempted robbery of S. and Y. at the check-cashing store.

DISCUSSION

I

Substantial Evidence Review

A. *Counts 1 and 4 and the Burglaries at the Store*

Garcia contends there was insufficient evidence to support his conviction on count 4 for burglary in connection with his entry into the bathroom with the felonious intent to commit sexual assault. He contends entry into the store itself (count 1) "subsumed entry into the bathroom located in the back of the store (count 4)" and, as such, his conviction on count 4 must be reversed.

1. *Guiding Principles*

"'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.]

8

"Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]" [Citation.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]."' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507–508.)

Section 459 defines the crime of burglary as entry into "any house, *room*, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building . . . with intent to commit grand or petit larceny or any other felony . . . ." (Italics added.)

The precise issue before us, in which a defendant is convicted of multiple burglaries based on crimes committed with the requisite felonious intent in multiple "rooms" in a single commercial building, appears to be one of first impression. In *People v. Sparks* (2002) 28 Cal.4th 71, 73 (*Sparks*), our Supreme Court in a unanimous opinion held that an entry into an *unsecured* bedroom within a single-family residence with the requisite intent (to commit rape) was sufficient to support a burglary conviction under section 459, even if that intent was formed after the defendant initially entered the house

9

with the permission of the owner.  The *Sparks* court concluded that the words "any . . . room" in section 459 had a plain and ordinary meaning and rejected the argument of the defendant that the word "room" in this statute requires entry into a "'room' that constitutes a 'separate unit' or a 'separately secured' or 'separately occupied' portion of a building or structure."  (*Sparks*, *supra*, 28 Cal.4th at pp. 76-77, fn. omitted.)

In so doing, the court in *Sparks* extensively reviewed earlier decisions construing the word "room" in our burglary statute, which discussion is pertinent to the issue before us and which we therefore quote at some length:

"This court directly ruled upon the meaning of the word 'room,' as used in section 459, for the first time in *People v. Young* (1884) 65 Cal. 225 (*Young*).  In that case, the defendant entered a public railway station and thereafter entered a ticket office (which apparently had walls that were eight to nine feet high but did not reach the ceiling) located within the station.  We rejected the theory that section 459 required the defendant to have formed the required intent prior to entering the railway station, so long as he formed that intent prior to entering a room within that structure—the ticket office.  Accordingly, we held that the trial court did not err in refusing a requested defense instruction that if the defendant conceived his intent to steal after he entered the railway station building, the jury should find the defendant not guilty.  (*Young*, at p. 226.)  We stated:  'One who enters, with burglarious intent, a room of a house enters the house with such intent. . . .'  (*Ibid.*)  In this regard, *Young* reflected the prevailing common law

10

understanding that entry from inside a structure into a room within that structure could constitute a burglary.

"Subsequent to *Young*, a number of California appellate court decisions have held that entry into various types of rooms can constitute burglary.

"Most of these cases, like *Young,* concern entry into private rooms within public or commercial buildings. (E.g., *People v. Elsey* (2000) 81 Cal.App.4th 948 (*Elsey*) [entry into separate, locked school classrooms]; *People v. Church* (1989) 215 Cal.App.3d 1151 [entry into separately leased and locked offices in an office building]; *People v. Mackabee* (1989) 214 Cal.App.3d 1250 [entry into an enclosed 'office area' set off by 'a waist-high counter about two-and-one-half feet wide' in the lobby of a building otherwise open to the public]; *People v. Edwards* (1971) 22 Cal.App.3d 598 [entry into women's restroom inside hospital]; *People v. Garcia* (1963) 214 Cal.App.2d 681 [entry into enclosed storage cage within a liquor store], disapproved on another ground in *Mozzetti v. Superior Court* (1971) 4 Cal.3d 699, 706; *People v. Davis* (1959) 175 Cal.App.2d 365 [entry into closed office from 'lubrication room' of a service station]; *People v. Gaytan* (1940) 38 Cal.App.2d 83 [entry into storage room of cafe].)

"In other decisions, courts have upheld burglary convictions based upon the defendant's (i) entry into a private room within a multi-unit lodging facility (e.g., *People v. O'Keefe* (1990) 222 Cal.App.3d 517 (*O'Keefe*) [entry into separate student dormitory rooms]; *People v. Fleetwood* (1985) 171 Cal.App.3d 982 [entry into motel room]), (ii) entry from the garage of a single-family home into a locked kitchen (*People v. Thomas*

11

(1991) 235 Cal.App.3d 899 (*Thomas*)), and (iii) entry, from inside a home, into a rented and locked bedroom within the home (*People v. Wilson* (1989) 208 Cal.App.3d 611).

"Of all the cases applying section 459, only one, *People v. McCormack* (1991) 234 Cal.App.3d 253 (*McCormack*), concerns the precise type of entry we face here—entry, by an ostensible guest in the home, from inside the living quarters of a single-family home, into the unsecured bedroom of a member of a family living in the home.  Most of the other recent decisions described above—specifically, *Elsey*, *supra*, 81 Cal.App.4th 948, *Thomas*, *supra*, 235 Cal.App.3d 899, and *O'Keefe*, *supra*, 222 Cal.App.3d 517— have made a point of distinguishing *McCormack* and the normal single-family-home setting.  We first discuss *McCormack*, and then the three other cited appellate decisions. [¶] . . . [¶]

"The defendant in *McCormack*, *supra*, 234 Cal.App.3d 253, entered a single-family home through an unlocked door, assertedly at the occupant's invitation.  The occupant—the brother of the homeowner—observed the defendant in the kitchen and asked him to leave the house, but the defendant refused to do so.  Instead, the defendant asked the occupant whether he wanted a beer and requested permission to use the telephone.  (*Id.*, at p. 255.)  The occupant departed and telephoned the police from a neighbor's residence.  When the police arrived, they found the defendant (in a hallway of the home) holding items taken from bedrooms.  The defendant was charged with a single count of burglary.  The trial court instructed that the "'intent [to steal the personal property of another] need not be in the mind of the person at the time of the initial entry

12

into the structure, if he [or she] subsequently forms the intent and enters a room within the structure."' (*Ibid.*, bracketed material in original.) Consistent with this instruction, the prosecutor argued to the jury that the defendant committed burglary even if he formed the intent to steal after entering the house, so long as he did so before he entered one of the bedrooms. (*Ibid.*) The defendant was convicted of burglary and appealed.

"The Court of Appeal in *McCormack* found the trial court's instruction 'consistent with the literal language of the controlling code section. In its current form this code section states: "Every person who enters any . . . room . . . with intent to commit grand or petit larceny or any felony is guilty of burglary." (§ 459.) We have found no published decisions by a court of this state holding, on facts similar to those present here, that burglary is not committed when the intent to steal is formed after entry to a building but before entering a room therein from which the defendant intends to steal property.' (*McCormack*, *supra*, 234 Cal.App.3d 253, 255.) Relying upon our decision in *Young*, *supra*, 65 Cal. 225, and some of the Court of Appeal decisions cited *ante*, at pages 80-81, the court held that because 'the plain language of the code includes entry into a room within the definition of burglary,' the instruction was proper. (*McCormack*, at p. 256.)

"The court in *McCormack* also found that the basic policy underlying the burglary statute (see *People v. Gauze* (1975) 15 Cal.3d 709, 715) supported its view: 'Just as the initial entry into a home carries with it a certain degree of danger [to personal safety], subsequent entries into successive rooms of the home raise the level of risk that the burglar will come into contact with the home's occupants with the resultant threat of

13

violence and harm.  Applying the plain language of the statute therefore serves rather than frustrates the policy of the law.' (*McCormack*, *supra*, 234 Cal.App.3d at p. 257.)[3] [¶] . . . [¶]

"One year prior to *McCormack*, the Court of Appeal in *O'Keefe*, *supra*, 222 Cal.App.3d 517, addressed whether entries into separate rooms in a college dormitory supported convictions for separate burglary counts.  The court answered in the affirmative.  It reasoned that merely because 'each of the rooms is within the one building . . . does not mean they are not separate dwellings within the meaning of section 459,' and found that 'an individual student dormitory room is a separate inhabited dwelling within the meaning of section 459.' (*Id.*, at p. 521.)

"The defendant in *O'Keefe*, *supra*, 222 Cal.App.3d 517, attempted to avoid this conclusion by arguing that the student dormitory rooms were analogous to rooms in a single-family home (as to which, the defendant assumed, multiple convictions under § 459 would not be proper).  Without endorsing the defendant's assumption, the court in *O'Keefe* rejected the attempted analogy between dormitory rooms and bedrooms of a single-family home.  First, it observed, a student dormitory is 'analogous to a hotel or apartment complex' and not to a single-family home.  (*O'Keefe*, *supra*, 222 Cal.App.3d at p. 521.)  The court noted that '[i]n many apartment and hotel complexes, facilities are

---

3    "The court in *McCormack* also observed:  'The statute specifically prohibits entry into a "room."  If this wording did not serve the policy intended by the Legislature it need not have been included in the statute and it could have been removed or modified at any time in the more than 100 years since this code section was first adopted.' (*McCormack*, *supra*, 234 Cal.App.3d at p. 257.)"

14

shared but separate burglaries of the individual rooms may still occur' (*ibid.*), and it cited decisions finding the entry into a bedroom of a tenant of a home to be burglary, and the entry into separate rooms in a business complex to constitute separate burglaries. Second, the court in *O'Keefe* declined to analogize between students living in a dormitory and family residents occupying a single-family home, noting that although the dormitory residents 'may share kitchen and bathroom facilities . . . , this does not make them one big family. . . . [E]ach student lives and enjoys separate privacy in each of their individual dormitory rooms. These rooms are their homes while attending school. Unauthorized entry into each dormitory room presents a new and separate danger to each of the occupants. Accordingly, individual dormitory rooms and the students who occupy them are entitled to protection under the meaning of section 459.' (*O'Keefe*, 222 Cal.App.3d at p. 521.) [¶] . . . [¶]

"Shortly after *McCormack* was filed, the Court of Appeal decided *Thomas*, *supra*, 235 Cal.App.3d 899. In that case the defendant first entered the garage of a single-family residence and then, while still in the garage, forcibly entered locked living quarters of the home—the kitchen. The prosecutor in *Thomas* argued that the jury could convict the defendant of burglary if he formed an intent to steal in the garage but prior to entry into the kitchen. The defendant asserted that he could not be convicted of burglary under these circumstances, because when a garage is 'an attached, integral part of a house, it must be considered simply one room of several which together constitute the dwelling for purposes of burglary.' (*Id.*, at p. 905.) The court rejected the defense position, observing

15

that section 459 proscribed entry into a 'room' with felonious intent and 'nothing in this language . . . would exempt [the defendant] from conviction for burglary simply because his entry into the [victims'] house took place from the garage rather than from somewhere outdoors.' (*Thomas*, 235 Cal.App.3d at p. 905.)

"As in *O'Keefe,* however, the court in *Thomas, supra*, 235 Cal.App.3d 899, proceeded to distinguish the entry there at issue from other entries of rooms within single-family homes. The court emphasized that the defendant's 'forcible and unauthorized entry into the living quarters of the [victims'] home [from the garage] was precisely the evil that the burglary statute is designed and intended to prevent. *The kitchen was separate from the garage*. It was protected and secured by a locked door which [the defendant] forced open with a crowbar. The [victims'] expectation of privacy and security within their living quarters *was clearly greater than that in their garage*, even if the garage may be considered part of the entire dwelling for burglary purposes. In our opinion, it would defeat the purposes of the burglary statute to hold in this case that [the defendant] could not be found guilty of burglary unless it was shown that he conceived his felonious intent prior to entering the garage . . . .' (*Thomas*, *supra*, 235 Cal.App.3d at pp. 906-907, italics added.) In the course of its discussion, the court in *Thomas* also asserted in a footnote: '[W]here a burglar enters several rooms in a single structure, each with felonious intent, and steals something from each, ordinarily he or she cannot be charged with multiple burglaries and punished separately for each room burgled *unless* each room constituted a separate, individual dwelling place within the

16

meaning of sections 459 and 460.' (*Thomas*, *supra*, 235 Cal.App.3d at p. 906, fn. 2, italics in original.) [¶] . . . [¶]

"Most recently, the court in *Elsey, supra,* 81 Cal.App.4th 948, addressed the defendant's entry into six classrooms, some of them located in the same building, on a single school campus. The court, distinguishing 'entry into multiple rooms of a single-family house [from] the entries into multiple secured classrooms' (*id.*, at p. 960), upheld the resulting six burglary convictions.

"In so concluding, the court in *Elsey* noted that section 459 provides in relevant part that 'every person who enters a house [or] room . . .' with the requisite intent is guilty of burglary, and it reasoned that '[s]ince entry into a "house" with the requisite intent constitutes burglary under the plain language of [section 459], it would be redundant to claim that entry into the rooms of the house constitutes additional burglaries. The larger category subsumes the smaller.' (*Elsey*, *supra*, 81 Cal.App.4th at p. 959.) The court then addressed the general situation that we face here—formation of the requisite intent by an ostensible or actual guest, after his or her initial entry into the house, but prior to entry of the subject room within the house. The court commented: '*Of course, where the "house" may have been entered without the requisite intent, entry into the broader category does not constitute the burglary, allowing the courts to focus on an entry into a room in the house, with the requisite intent, as the basis for the burglary*.' (*Ibid.*, italics added.) [¶] . . . [¶]

17

"Defendant asserts that the interpretation of section 459 set out in *McCormack*, *supra*, 234 Cal.App.3d 25[3], will produce bizarre results. He echoes the Court of Appeal majority below, which observed that the defendant in *McCormack* entered the kitchen in the home without the intent necessary for burglary, and that if the defendant had formed the requisite intent while in the kitchen and yet thereafter did not enter any other room, he would not have been guilty of burglary[4]—but if the defendant had gone into another room and then reentered the kitchen, this time with the requisite intent, he would have been guilty of burglary. The Court of Appeal majority also asserted that allowing a conviction of burglary on the present facts improperly would subject defendants to conviction of multiple counts of burglary for every room in the house entered with the requisite intent.

"Justice Benke, dissenting in the Court of Appeal below, conceded that under *McCormack*'s interpretation of the statute, whether a particular entry into a room constitutes burglary will depend upon 'the location of an actor when the requisite intent is formed,' but further observed that this consequence 'is not the result of the *McCormack* rule but of the nature of the crime of burglary itself as defined in section 459.' Moreover,

---

4     "The statutes in some jurisdictions provide otherwise and include in their definition of burglary the situation where one enters *or remains* with the requisite intent. (See, e.g., Fla. Stat. ch. 810, § 10.02(1); Me. Rev. Stat., tit 17-A, § 401; N.J. Rev. Stat., § 2C:18-2; N.Y. Penal Law § 140.00, subd. 5; N.D. Cent. Code, § 12.1-22-02, subd. 1; Vt. Stat. Ann. tit. 13, § 1201.) Section 459, by contrast, requires an *entry* with requisite intent. Accordingly, in the present case, defendant would not have committed burglary if, after entering the home as a guest, he formed the requisite intent in the dining room or in the living room, but thereafter did not enter another room within the home with that intent."

18

Justice Benke noted that even if the interpretation of the statute set out in *McCormack, supra*, 234 Cal.App.3d 25[3], may 'allow[] the creative mind to formulate disconcerting hypotheticals about the application of the law of burglary,' the rule proposed by defendant would do so as well: 'For example, a person may enter a residence without the intent to commit a theft. He walks down a hall off of which there are two indistinguishable bedrooms. The first is the bedroom of a family member, the second the bedroom rented by a family friend. Under the [rule proposed by defendant and the majority below], if the person enters the first with the intent to commit a theft, he commits no burglary [because he has not invaded a separate possessory interest]. If he enters the second [with the intent to commit a theft], he commits a first degree burglary. This distinction makes no sense . . . and does not serve the policy basis of the crime.' Accordingly, Justice Benke concluded that the rule proposed by defendant 'simply exchanges one set of potential anomalies . . . for another,' and she asserted that '[i]f I must choose my anomalies . . . , then I believe I am duty bound to choose those created by the Legislature.' [¶] . . . [¶]

"As noted above, California decisions applying section 459 have upheld burglary convictions based upon entry into diverse types of rooms—among them ticket offices, liquor cages, business offices, enclosed counter areas, school classrooms, hotel rooms, apartments, a kitchen in a single-family home, and, in *McCormack, supra*, 234 Cal.App.3d 253, a bedroom within a single-family home. These decisions—and *McCormack* in particular—are consistent with common law cases from other

19

jurisdictions, recognizing as burglary the entry (with requisite intent), from within a home, into a bedroom inside the home.[5] Although the burglary statute historically has been the subject of frequent amendments, our Legislature has not revised section 459 to disapprove any of these decisions.[6] Furthermore, although in recent years the legislatures of many of our sister states have enacted statutes that have narrowed and confined the type of room that will qualify as the subject of a burglary . . . , the California Legislature, when presented with legislation that proposed similar amendments, did not adopt any similar amendment to our burglary statute.[7]

---

5     "The common law is well illustrated by *State v. Contreras-Cruz* (R.I. 2001) 765 A.2d 849. In that case the defendant was charged with burglary for entering the bedroom of his brother and the brother's girlfriend, while the brother was absent, with intent to sexually assault the girlfriend. The defendant claimed that he had his brother's permission to be inside the house. Applying Rhode Island General Laws, 1956 section 11-8-1 (1956) (which in turn incorporates the common law definition of burglary), the Rhode Island Supreme Court rejected the defendant's contention that permission to be inside the house negated the entry element. The court observed: 'It has long been held that while one may have permission to enter parts of a dwelling, entry into a room within that dwelling that a person does not have permission to enter can constitute burglary.' (*State v. Contreras-Cruz*, *supra*, at p. 854[;] see also *State v. Descant* (La. 1906) 117 La. 1016 [42 So. 486, 488] [entry by ostensible house guest, from within the home, into a woman's bedroom, constitutes burglary] . . . .)"

6     "Section 459 has been amended nine times since its codification in 1872, and has been the focus of at least 23 proposed amendments in the four decades since 1960. (See Table of Sections Affected in the 1960-1970 volumes of Cal. Legislature, Final Calendar of Legislative Business, and in the 1973-2000 volumes of Cal. Legislature, Legislative Index and Table of Sections Affected.) The section has been amended six times since 1977."

7     "In the 1970's, a period during which many other jurisdictions amended their burglary statutes consistent with the Model Penal Code to limit the subject of burglary to certain categories of rooms (for example, those that are 'separately occupied or secured'), omnibus legislative proposals that would have incorporated that *same* limitation in

20

"As the court observed in *McCormack*, *supra*, 234 Cal.App.3d 253, treating the entry at issue here as an entry for burglary is consistent with the personal security concerns of the burglary statute, because entry, from inside a home, into a bedroom of the home 'raise[s] the level of risk that the burglar will come into contact with the home's occupants with the resultant threat of violence and harm.' (*Id.*, at p. 257.) Here, the 22-year-old victim, living in her family's home, reasonably could expect significant additional privacy and security when she retreated into her own bedroom. Accordingly, consistent with California decisions construing section 459, reaching back to *People v. Young*, *supra*, 65 Cal. 225, and consistent with the common law and the history of section 459, we conclude that the unadorned word 'room' in section 459 reasonably must be given its ordinary meaning. It follows that the trial court did not err in this case by instructing the jury that entry into [the victim's] bedroom with the specific intent to commit rape constitutes a burglary in violation of section 459.[8]" (*Sparks*, *supra*, 28 Cal.4th at pp. 79-87, some fns. omitted.)

section 459 were introduced in the California Legislature on four occasions but were not enacted. (See Sen. Bill No. 1506 (1972 Reg. Sess.) [proposed new Criminal Code, § 12601, subd. (a)]; Sen. Bill No. 39 (1973-1974 Reg. Sess.) [same]; Sen. Bill No. 565 (1975-1976 Reg. Sess.) [same]; Sen. Bill No. 27 (1977-1978 Reg. Sess.) [same].)

"To be sure, it is important that we be careful not to place undue significance on these unsuccessful legislative proposals. Each of the bills referred to in the prior paragraph proposed omnibus legislation that would have substantially overhauled the entire Penal Code. As we have noted, 'unpassed bills, as evidences of legislative intent, have little value' (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1396, and cases cited), and provisions contained within unpassed *omnibus* bills are, if anything, even less reliable indicants of legislative intent. Nonetheless, this history does reveal that although there have been some relatively recent attempts to limit the term 'room' in section 459, to date no such proposal has been adopted."

The Court of Appeal in *People v. Richardson* (2004) 117 Cal.App.4th 570 (*Richardson*) was presented with a factual scenario somewhat similar to the one raised, but not decided, by the *Sparks* court in footnote 8, *ante*. In *Richardson*, two women shared a two-bedroom apartment. Each roommate occupied one of the bedrooms, but neither room had locks on the doors. In addition, one of the roommates stored personal items in the other roommate's closet. When the apartment was empty, the defendant, who was the brother of one of the roommates, entered and stole items from both of the rooms. The defendant was convicted of two counts of burglary. The Court of Appeal reversed.

The *Richardson* court concluded that under the facts of the case, the two women could not "have had a separate, reasonable expectation of protection against an unauthorized entry" inasmuch as they "rented the apartment together as friends," "shared space in their rooms" and neither room had a lock on the door, which the court found was similar to the living arrangement of a "single-family household." (*Richardson*, *supra*, 117 Cal.app.4th at pp. 575-576.) The court noted that there was no evidence in the record as to the defendant's intent, including whether the defendant intended to burglarize both rooms as he entered the apartment or whether he formed the intent to burglarize a second bedroom after he burglarized the first. (*Ibid.*) In addition, the court rejected the

---

8 "In reaching this conclusion, we emphasize that our holding does not signify that a defendant who, with the requisite felonious intent, enters multiple unsecured rooms in a single-family house properly may be convicted of multiple counts of burglary. As noted above, some California decisions have questioned whether multiple convictions might be sustained on such facts (*Thomas*, *supra*, 235 Cal.App.3d 899, 906, fn. 2; see also *Elsey*, *supra*, 81 Cal.App.4th 948, 959), and we have no occasion to consider that issue in this case, in which multiple burglary convictions are not involved."

22

contention that because the defendant knew beforehand that the apartment was occupied by two roommates, he could be guilty of multiple burglaries, noting that such knowledge is "'usually fortuitous'" and "'not determinative of whether a burglary has occurred.'" (*Ibid.*)

The *Richardson* court relied on *Thomas* for the proposition that when "'a burglar enters several rooms in a single structure, each with felonious intent, and steals something from each, ordinarily he or she cannot be charged with multiple burglaries and punished separately for each room burgled *unless* each room constituted a separate, individual dwelling place within the meanings of sections 459 and 460.'" (*Richardson*, *supra*, 117 Cal.App.4th at p. 575, quoting *Thomas*, *supra*, 235 Cal.App.3d at p. 906, fn. 2.) The court recognized this language from *Thomas* was discussed in *Sparks* (see fn. 8, *ante*) and thus found *Sparks* "does not stand for the proposition that multiple burglary convictions may be founded on a defendant taking items from several rooms within a single dwelling." (*Thomas*, at p. 576.)

Recently, this court decided *In re M.A.* (2012) 209 Cal.App.4th 317 (*M.A.*), which addressed an issue similar to the one discussed in *Sparks*. In *M.A.*, we concluded that a minor who stole guns from a three and one-half by four foot closet located in the foyer of a home could support a true finding of first degree burglary, even if the minor formed the felonious intent after he entered the home. (*Id.* at p. 321.) We further concluded that a closet was a "room" within the ordinary meaning of this word. (*Id.* at p. 323; see also *People v. Mackabee* (1989) 214 Cal.App.3d 1250, 1257 (*Mackabee*) [noting a "common

23

definition of a room" is "'a part of the inside of a building, shelter or dwelling usually set off by a partition'"].)  We also concluded that the policies behind the burglary laws, namely concerns of "personal security" with the attendant risk of violence and harm to the occupants and the prevention of an intrusion into an area where the occupants "'reasonably could expect significant additional privacy and security,'" supported our decision to treat a closet as a "room" for purposes of section 459.  (*M.A.*, *supra*, 209 Cal.App.4th at pp. 322-323.)

2. *Analysis*

Regarding count 1, the record shows the prosecutor during closing argued that when Garcia (re)entered the store, he did so with the intent to commit robbery.  The record shows that before Garcia entered the store, he rode his bicycle slowly in front of the store, looking inside.  When fellow employee G.C. left for the day, Garcia for the first time entered the store, looked around and then left.  A short time later, Garcia reentered the store, started asking M. what she described as "weird" questions and subsequently pulled out a gun from his jacket pocket, pointed it at M. and demanded that she hand over the money from the store's cash register.  Garcia, while still pointing a gun at M., next demanded that she hand over any money she had on her person.  We conclude this evidence provides ample support for Garcia's burglary conviction on count 1, which, in any event, Garcia does not challenge on appeal.

The record shows the prosecutor also argued during closing that once inside the store, Garcia formed the separate intent to commit the sexual assault, which later

24

involved a second burglary when Garcia entered the bathroom located in the back of the store and sexually assaulted M.

We conclude on this record that substantial evidence also supports Garcia's burglary conviction on count 4. First, in light of *Sparks*, *M.A.* and *Mackabee* among other authorities (as discussed in *Sparks*), we conclude the bathroom Garcia entered to sexually assault M. constitutes a "room" for purposes of section 459 based on the plain and ordinary meaning of the word. Second, we further conclude one of the main policies underlying the burglary statute—to prevent intrusion into an area in which the occupants "'reasonably could expect significant additional privacy and security'" (see *M.A.*, *supra*, 209 Cal.App.4th at p. 322, quoting *Sparks*, *supra*, 28 Cal.4th at p. 87)—supports the conclusion that Garcia's entry with the requisite felonious intent into the bathroom in the back of the store constituted a separate burglary.

Indeed, the record shows Garcia forced M. at gunpoint to close the front doors of the store, remove the "open" sign hanging by the doors and turn off the store lights. Next, he motioned with the gun for M. to walk down the hallway, toward the back of the store. When they stopped at the refrigerators, he asked M. if she had a key to the office, which was locked. M. said no. He then asked M. whether there was a bathroom inside the store. M. said yes. This evidence supports the finding that the bathroom provided additional privacy and security from the main part of the store, inasmuch as M. testified the bathroom was not visible from the main part of the store and even Garcia, while standing in the hallway, asked whether the store had a bathroom.

25

Moreover, the record shows that M. initially refused Garcia's demands—even at gunpoint—that she go to the bathroom in the back of the store because she was afraid of what he would do to her in the bathroom. Although M. was afraid when Garcia initially pulled out the gun and demanded money, the record shows she got on her hands and knees and begged Garcia not to harm her *after* he demanded at gunpoint that she go inside the bathroom in the back of the store. This evidence provides additional support for the finding that the bathroom provided "'significant additional privacy and security'" (see *M.A.*, *supra*, 209 Cal.App.4th at p. 322, quoting *Sparks*, *supra*, 28 Cal.4th at p. 87) than did the main part of the store and that Garcia's intrusion into the bathroom constituted a separate burglary inside the store.

Third, this evidence and the inferences drawn from it also support the finding of the jury that Garcia formed the *separate* felonious intent to sexually assault M. in the bathroom *after* he had entered the store and *after* he had taken the money from the store cash register and from M.'s person. Indeed, once Garcia took the money he could have simply left the store. Instead, as noted, he made M. close up the store and ordered her into the bathroom in the back of the store where he forced her at gunpoint to remove her clothes and then sexually assaulted her after she was tied up.

Garcia relies on *Richardson* and *Thomas* among other authorities in contending "that a defendant can only be convicted of a single burglary if [the defendant] enters a single business or residence with felonious intent and commits several crimes within that structure." We conclude neither case supports Garcia on the facts presented here.

26

In *Richardson*, as we noted already, the court there specifically recognized that there was "no evidence in the record as to [the defendant's] intent: whether he intended to burglarize both rooms as he entered the apartment [shared by the two roommates], or whether he formed the intent to burglarize a second bedroom after burglarizing the first." (See *Richardson*, *supra*, 117 Cal.App.4th at p. 575.) In contrast, there is substantial evidence in the instant case supporting the finding that Garcia formed the felonious intent—for purposes of his entry into the bathroom to commit the sexual assault on M.— *after* he entered the store with the felonious intent to steal the money at gunpoint. The situation here is thus entirely distinguishable from the facts of *Richardson*, where the defendant simultaneously stole items from each of the unoccupied rooms of the two roommates that shared an apartment, which the court concluded was akin to a single-family dwelling.

We also conclude *Thomas* is inapposite here. As noted by the *Sparks* court, the issue in *Thomas* was whether a defendant could be guilty of burglary if the defendant formed the intent to steal inside a garage but before he entered a locked kitchen, even if the defendant allegedly did not form that intent when he first entered the garage itself. (See *Thomas*, *supra*, 235 Cal.App.3d at pp. 903-904.) The issue in *Thomas* thus did not involve a conviction for multiple counts of burglary, as in the instant case in which a defendant such as Garcia formed the requisite felonious intent to commit a crime (i.e., the sexual assault in the bathroom) *after* he entered the building with the separate felonious intent to commit theft.

27

Garcia, however, relies on the language from *Thomas*, discussed by *Sparks* in footnote 8, *ante*, where the *Thomas* court in a footnote stated in part: "[W]here a burglar enters several rooms in a single structure, each with felonious intent, and steals something from each, ordinarily he or she cannot be charged with multiple burglaries and punished separately for each room burgled *unless* each room constituted a separate, individual dwelling place within the meaning of sections 459 and 460. That is not the case here; appellant was not charged with multiple burglaries, and the People do not contend that he could have been." (See *Thomas*, *supra*, 235 Cal.App.3d at p. 906, fn. 2.)

We conclude this language from *Thomas*—which was also quoted in *Richardson* among other cases—is pure dictum, a view we conclude was also shared by our Supreme Court in *Sparks*. (See *Sparks*, *supra*, 28 Cal.4th at pp. 87-88, fn. 21 [citing *Thomas* and noting it and other cases "have questioned whether multiple convictions *might* be sustained" when "a defendant, who, with the requisite felonious intent, enters multiple unsecured rooms in a single-family house properly may be convicted of multiple counts of burglary" (italics added)].) In any event, as noted, the issue before us does *not* involve the simultaneous theft of items from multiple rooms from a structure/single-family dwelling.[9]

---

[9]     We thus do not decide in this opinion the question raised by our Supreme Court in *Sparks* regarding whether a defendant possessing the requisite felonious intent could be convicted under section 459 of multiple counts of burglary for his or her entry in, and theft of items taken from, multiple "rooms" in a structure/single-family house. (See *Sparks*, *supra*, 28 Cal.4th at p. 87, fn. 21.)

Given the substantial factual differences between the instant case, on the one hand, and *Richardson* and *Thomas* and similar authorities, as discussed in *Sparks*, on the other hand, and given the language from *Thomas* on which Garcia relies is, in any event, dictum and inapplicable under the facts of this case, we affirm his conviction on count 4 and reject his contention that he could only be convicted of a single count of burglary on count 1 because the "room" (i.e., bathroom) he separately entered with the requisite felonious intent to commit the sexual assault of M. also happened to be located inside the store.

B. *Counts 8 and 9 and the Attempted Robbery of S. and Y.*

Garcia contends the evidence is insufficient to support the jury's finding that he possessed the specific intent to commit the attempted robbery of S. and Y. Section 211 defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

"An attempt to commit a crime is comprised of 'two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.' (§ 21a; see § 664 [prescribing punishment].) Other than forming the requisite criminal intent, a defendant need not commit an element of the underlying offense. [Citations.] We have explained that 'under California law, "[a]n attempt to commit a crime is itself a crime and [is] subject to punishment that bears some relation to the completed offense." [Citation.] . . . [¶] . . . "One of the purposes of the criminal law is to protect society from those who

29

intend to injure it. When it is established that the defendant intended to commit a specific crime and that in carrying out this intention he committed an act that caused harm or sufficient danger of harm, it is immaterial that for some collateral reason he could not complete the intended crime." [Citation.]' [Citation.]" (*People v. Medina* (2007) 41 Cal.4th 685, 694, fn. omitted.) "Intent to steal is often proved by circumstantial evidence." (*People v. Abilez* (2007) 41 Cal.4th 472, 508.)

Here, the record shows that S. and Y. closed the store earlier than usual on the night of the crime because it had been a "really slow day" at work; that as S. and Y. walked toward their cars, a man later identified as Garcia approached them, told them to stop and demanded that they reopen the store; that S. and Y. pretended not to hear Garcia and kept walking but, as they got closer, Garcia said, "you got to stop," pulled out a gun and used it to wave them in the direction of the front door of the check-cashing store while repeating his demand that they open the door and telling them not to be "stupid"; that Garcia admitted to law enforcement during a postarrest interview he needed money and considered robbery that morning; that Garcia knew the check-cashing store dealt with money because his girlfriend's mother used the store to cash checks and pay loans; that a few hours earlier, Garcia had robbed the store and M. of only about $73; and that after S. and Y. ran to the gas station, Garcia left in the SUV and drove to a nearby laundromat, where he waited outside the vehicle.

Viewing the evidence in the light most favorable to the prosecution (*People v. Watkins* (2012) 55 Cal.4th 999, 1019), we conclude this evidence is more than sufficient

30

to support the finding beyond a reasonable doubt of a rational trier of fact that Garcia had focused on and intended to rob S. and Y. (See *id.* at pp. 1019-1021 [rejecting the defendant's contention there was insufficient evidence in the record to support his attempted robbery conviction of a victim after the evidence showed defendant already had robbed three people at gunpoint before he and his accomplice drove to a hotel and pretended their car broke down as they watched the victim unloading suitcases from his car, and noting that """""*[i]f the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment*"""""].)

II

Count 6 and Instructional Error

The record shows the trial court instructed the jury with CALCRIM No. 1045 as follows:

"The defendant is charged in Count Six with sexual penetration by force, fear, violence, menace, or fear of immediate and unlawful bodily injury to another, in violation of Penal Code section 289(a). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act of sexual penetration with another person; [¶] 2. The penetration was accomplished by using a foreign object or unknown object; [¶] 3. The other person did not consent to the act; [¶] AND [¶] 4. The defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to anyone.

31

"*Sexual penetration* means penetration, however slight, of the genital or anal opening for the purpose of sexual abuse, arousal, or gratification.

"A *foreign object* includes any part of the body except a sexual organ.

"An *unknown object* includes any foreign object, substance, instrument, or device, or any part of the body, **including a penis**, if it is not known what object penetrated the opening.

"Penetration for *sexual abuse* means penetration for the purpose of causing pain, injury, or discomfort.

"In order to *consent*, a person must act freely and voluntarily and know the nature of the act.

"*Duress* means a direct or implied threat of force, violence, danger, hardship, or retribution that is enough to cause a reasonable person of ordinary sensitivity to do or submit to something that he or she would not otherwise do or submit to.  When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant.

"*Menace* means a threat, statement, or act showing an intent to injure someone.

"An act is *accomplished by fear* if the other person is actually and reasonably afraid."  (Original italics; bold added.)

Garcia contends the trial court had a sua sponte duty to modify CALCRIM No. 1045 to exclude the bold font above—including a penis—from the definition of an "unknown object" with respect to count 6, rape of M. by a foreign or unknown object,

32

because he contends there allegedly was only a single and uninterrupted sex act in the instant case and because count 5 alleged forcible rape of M. According to Garcia, it therefore was possible for the jury to convict him on counts 5 and 6 for the same act of penile penetration.

The People contend CALCRIM No. 1045 tracks the language of section 289, subdivision (k)(2) and (3) regarding the definition of "foreign object" and "unknown object," respectively, and, as such, it was incumbent on Garcia to request any further clarification or amplification he deemed appropriate and his failure to do so constitutes a forfeiture of this issue on appeal. The People further contend that, on the merits, there was no instructional error because it was not reasonably likely a jury construed them in the manner claimed by Garcia. Because we agree with this latter contention, we do not address forfeiture.

"When instructions are claimed to be conflicting or ambiguous, 'we inquire whether the jury was "reasonably likely" to have construed them in a manner that violates the defendant's rights.' [Citation.] We look to the instructions as a whole and the entire record of trial, including the arguments of counsel. [Citations.] We assume that the jurors are ""intelligent persons and capable of understanding *and correlating* all jury instructions . . . given."" [Citation.]" (*People v. Franco* (2009) 180 Cal.App.4th 713, 720.)

Here, our examination of the entire record shows no reasonable likelihood Garcia's jurors were misled or applied CALCRIM No. 1045 in the manner asserted by him.

33

Indeed, as noted *ante*, the record shows the jury saw the video interview of Garcia where he admitted to the officers that he digitally penetrated M. inside the bathroom about seven or eight times. This testimony was confirmed by M., who also said she could feel Garcia's fingers inside her vagina as he stood behind her in the bathroom.

In addition, during closing argument, the prosecutor was clear that count 5, forcible rape, occurred (if at all) when Garcia held a gun to M. and used his penis to penetrate her vagina without consent. Regarding count 6, the prosecutor stated a "foreign object" for purposes of forcible sexual penetration "includes any part of the body except a sexual organ; right? And that's because we already have a crime that's laid out for when you use a sexual organ, that is rape. There's an exception to that however, is it could, if the woman didn't know what it was that was inside of her turns out that it happened to be a penis, you could still use this statute [i.e., § 289]. *In this case that's not a question because she knows that the penis and his fingers were inside of her.*" (Italics added.)

During the closing argument of the defense, the record shows that counsel stated that Garcia "absolutely admits to digital penetration" of M.'s vagina. During rebuttal, the prosecutor noted the penetration for purposes of the verdict form on count 6 was Garcia's fingers, a "foreign object." Finally, in reviewing the jury verdict form for count 6, we note it repeatedly used only the term "foreign object," which excluded from its definition a sexual organ, and *not* the term "unknown object," which included in its definition a penis, in the questions to be answered by the jury on this count.

34

In light of the instructions as a whole—including the exclusion of a sexual organ from the definition of a "foreign object" as set forth in subsection (k)(2) of section 289, and the evidence in the record—including the arguments of counsel and the verdict form itself, we conclude it was not reasonably likely that the jury here applied CALCRIM No. 1045 to find the "foreign object" that penetrated M. for purposes of count 6 was Garcia's penis, as opposed to his fingers.[10]  (See *People v. Franco*, *supra*, 180 Cal.App.4th at p. 720.)  We thus conclude there was no instructional error in connection with count 6.

### III

### Sentencing Issues

A.  *Counts 5 and 6*

1.  *Additional Background*

Garcia contends the trial court erred when it sentenced him to consecutive terms of 25 years to life on counts 5 and 6 because he allegedly committed one indivisible act of rape that violated two statutes.  The record shows the prosecutor initially believed that Garcia should have received concurrent sentences on these two counts because M. was

---

[10]    As such, we also reject Garcia's alternate contention that the trial court was required to give a unanimity instruction on the nature of the "foreign object" used, inasmuch as the evidence in the record overwhelmingly shows Garcia's fingers were the "foreign object" used to penetrate M.'s vagina in connection with count 6 and, in any event, this term excludes a penis from its statutory definition.  (See *People v. Russo* (2001) 25 Cal.4th 1124, 1132 [noting the "requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed,'" and noting that "where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty"].)

unsure whether the defendant penetrated her vagina with his finger and penis at the same or separate times. At the sentencing hearing, the record shows that the prosecutor reiterated this belief and that defense counsel noted there could be "two separate, distinct purposes" but that, in this case, the "use of digital penetration in order to accomplish penile penetration would be one act."

The trial court disagreed. In so doing, the court noted the act of digital penetration was entirely separate from the act of penile penetration:

"Wouldn't it necessitate that, as I heard the evidence, that they were completely separate acts, that they [i.e., the digital and penile penetrations] were distinctly different functions. And even though they are not temporally isolated, they are in the physical act itself. And each act requires a different intent, one is digital penetration, the other is a thoughtful, knowing penile penetration. And those are two separate acts that require goal-oriented behavior leading to a goal-oriented outcome . . . ."

In response, the defense argued—as it does on appeal—that the use of digital penetration to accomplish the penile penetration "would be one act. So, if you're using it *just* for that purpose it would be one act." (Italics added.) The court expressed skepticism with this analysis but found the evidence did not support it in any event:

"Yeah, well, I don't know if I agree with that. But that's not the evidence that I heard. And not to engage in too much discussion, but I think one thing when you look at non separate acts in the sexual assault context, this could be -- an example might be, a defendant, not this defendant, a defendant in the midst of digital penetration penetrates

36

twice in a very short period of time with a finger, that is completely different than an event that I heard in this trial.

"And I paid close attention while the victim was testifying and a couple things rang true to me, one is she was very credible. I think the jury found that. The only counts that were lost by the people were counts that had really nothing to do with this victim. But more importantly, not only her credibility but her ability to recite the events. And even the defendant, in his statement to the police, partitions the events. There's an act of robbery. They you could say breaking -- into -- there's an act of entry into the building, there's an act of threat of force and robbery, there's an act of substantial movement to the bathroom. Once in the bathroom then there has to be a continuing intent; right? There has to be a goal in moving her to the bathroom, and the goal was to accomplish some act of sexual assault.

"But at that point where he decides to engage in sexual assault he has a plethora of choices for a sexual assault. He chooses one. Then he chooses another. And each time he chooses, that evidences a distinct, clear separate intent, which this court thinks is a distinct, clear, separate event and occasion. And that's why I don't have any problem in sentencing him to a consecutive term."

2. *Governing Law and Analysis*

Section 667.61, also known as the one strike law, "sets forth an alternative and harsher sentencing scheme for certain enumerated sex crimes perpetrated by force, including rape, foreign object penetration, sodomy, and oral copulation." (*People v.*

37

*Mancebo* (2002) 27 Cal.4th 735, 741, fns. omitted.)  The Legislature enacted section 667.61 to ensure that serious sexual offenders receive long prison sentences regardless of their prior criminal records.  (*People v. Wutzke* (2002) 28 Cal.4th 923, 929; see also *People v. Luna* (2012) 209 Cal.App.4th 460, 465.)

In addition, section 667.61 requires imposition of "a *consecutive* sentence for each offense . . . if the crimes involve separate victims or involve the *same victim on separate occasions* as defined in subdivision (d) of Section 667.6."  (§ 667.61, subd. (i), italics added; see also *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1489.)  Once the trial court resolves the issue of whether a defendant committed sex crimes on separate occasions, an appellate court may not overturn the result unless no reasonable trier of fact could have so found.  (See *People v. Garza* (2003) 107 Cal.App.4th 1081, 1092; *People v. Plaza* (1995) 41 Cal.App.4th 377, 384.)

Section 667.6, subdivision (d) provides:  "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior.  Neither the duration of time between crimes, nor whether . . . the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

A finding that the defendant committed the sex crimes on separate occasions does not require a break of any specific duration or any change in physical location. (*People v. Jones* (2001) 25 Cal.4th 98, 104 [construing former § 667.6]; see also *People v. Irvin* (1996) 43 Cal.App.4th 1063, 1071 [also construing former § 667.6 and concluding a trial court at sentencing "could find a defendant had a 'reasonable opportunity to reflect upon his or her actions' even though the parties never changed physical locations and the parties 'merely' changed positions"].)

Here, the record shows that Garcia committed at least two entirely separate and distinct acts of penetration of M.'s vagina. Garcia admitted to police that he used three fingers to penetrate M.'s vagina about seven or eight times. The record also shows that, while they were in the bathroom, Garcia penetrated M.'s vagina with his penis, as DNA later taken from inside M.'s vagina matched Garcia's profile.

That M. testified she thought Garcia had his fingers and penis inside her vagina at the same time is not determinative here. For one thing, the record shows Garcia made M. turn around so that her back was to him. In addition, M. testified she *thought* Garcia had his fingers and penis inside of her at the same time. Moreover, the record shows that, at some point, Garcia made M. turn off the light in the bathroom while he continued his sexual assault of her. And, of course, Garcia admitted to police that he digitally penetrated M. seven or eight times, which evidence strongly supports the finding of the trial court that Garcia's use of his fingers to penetrate repeatedly M.'s vagina involved a separate, distinct and additional intent from his intent to penetrate her with his penis. As

39

the statute instructs, the duration of time between the acts and the retention of the *opportunity to attack* again are not themselves determinative. (See § 667.6, subd. (d).)

Because we conclude a reasonable trier of fact could conclude that in between each of two separate offenses—digital penetration of M. multiple times and rape—Garcia "had a reasonable opportunity to reflect upon his . . . actions and nevertheless resumed [his] sexually assaultive behavior" (see § 667.6, subd. (d); see also § 667.61, subd. (i)), we further conclude the trial court properly imposed consecutive sentences on Garcia of 25 years to life on counts 5 and 6 as mandated under section 667.61.

B. *Count 4*

Garcia contends the trial court also erred by not staying under subdivision (a) of section 654 his sentence for burglary in count 4 because this statute prohibits punishment for the intended felony underlying burglary and for the burglary. (See *People v. Islas* (2012) 210 Cal.App.4th 116, 130.) We agree.

Subdivision (a) of section 654 provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." Section 654 applies where there is a course of conduct that violates more than one section of the Penal Code but nevertheless constitutes an indivisible transaction. (See, e.g., *People v. Pena* (1992) 7 Cal.App.4th 1294, 1311-1313 [a defendant who unlawfully enters a home for the sole purpose of sexual assault may not be separately punished for the burglary and the sex

40

crimes]; *People v. McElrath* (1985) 175 Cal.App.3d 178, 191 [where the intent to commit sex offenses formed the factual basis of the burglary conviction, § 654 bars a concurrent term for burglary].)

Here, the evidence in the record shows that the factual basis for the conviction on count 4 was burglary—Garcia's entry into the bathroom inside the store—with the requisite intent to commit the sexual assault charged in counts 5 and 6.

The People contend that section 667.6, subdivision (d), as stated *ante*, provides an exception to section 654 for sex offenses. In support of this contention, the People rely on *People v. Hicks* (1993) 6 Cal.4th 784, 797 (*Hicks*), which concluded that the "imposition of a sentence for [a] burglary conviction, in addition to the consecutive full-term sentences imposed for the related enumerated sexual offenses, was authorized by section 667.6[, subdivision] (c), notwithstanding section 654's general proscription against multiple punishment for offenses committed during an indivisible course of conduct."

However, the record clearly shows that Garcia was not sentenced under section 667.6, but rather under section 667.61. In addition, we note that *Hicks* involved an interpretation of *former* subdivision (c) of section 667.61 and specifically involved language that has since been repealed by Jessica's Law, enacted by an initiative, The Sexual Predator Punishment and Control Act. (Prop. 83, § 31, approved Nov. 7, 2006, eff. Nov. 8, 2006.)[11]

---

11    As relevant here, Jessica's Law "repealed language that authorized a trial court to impose 'a full, separate and consecutive term . . . for each violation of [enumerated sex

41

Finally, we note that the defendant in *Sparks*, like Garcia here, was sentenced under section 667.61, subdivision (a) to 25 years to life for rape committed during a burglary. (See *Sparks*, *supra*, 28 Cal.4th at p. 75, fn. 5.) We further note, however, that the defendant in *Sparks* was *not* separately sentenced for the burglary conviction standing alone. (*Ibid.*)

We thus conclude the trial court erred when it refused to stay under section 654, subdivision (a) Garcia's conviction for burglary in connection with count 4, which occurred when he entered the bathroom inside the store with the requisite intent to commit the sexual assault on M.

IV

Restitution Fine

At sentencing, the trial court ordered Garcia to pay a restitution fine in the amount of $10,000, as recommended in the probation report. The record shows the court did not make any specific factual findings or state the reason or reasons it imposed the fine in this amount, which was and remains the statutory maximum under subdivision (b)(1) of section 1202.4. The record shows Garcia did not object to the restitution fine.

In 2011, when the crimes at issue were committed, section 1202.4, subdivision (b) then provided: "In every case where a person is convicted of a crime, the court shall

offenses] *whether or not the crimes were committed during a single transaction.*'" (*People v. Goodliffe* (2009) 177 Cal.App.4th 723, 726, fn. 7, quoting former § 667.6, subd. (c).) We note this is the *same* language the *Hicks* court relied on when it concluded former section 667.6, subdivision (c) created an exception to section 654's prohibition against multiple punishment for separate offenses committed during an indivisible course of conduct. (*Hicks*, *supra*, 6 Cal.4th at pp. 791-792.)

impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record."  In the case of a felony conviction, the minimum restitution fine was $200 and the maximum fine was $10,000.[12]  (Former § 1202.4, subd. (b)(1).)  The fine was to "be set at the discretion of the court and commensurate with the seriousness of the offense."  (*Ibid.*)

Former section 1202.4, subdivision (d) provided: "In setting the amount of the fine pursuant to subdivision (b) in excess of the two hundred-dollar ($200) . . . minimum, the court shall consider any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime.  Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime.  Consideration of a defendant's inability to pay may include his or her future earning capacity.  A defendant shall bear the burden of demonstrating his or her inability to pay.  *Express findings by the court as to the factors bearing on the amount of the fine shall not be required.  A separate hearing for the fine shall not be required.*"  (Italics added.)

---

[12]    Subsequent amendments to section 1202.4 raised the statutory minimum but did not change the statutory maximum of $10,000, which, as noted, was the amount imposed here by the trial court.

43

Garcia asserts that under *Southern Union Co. v. United States* (2012) ___ U.S. ___ [132 S.Ct. 2344] (*Southern Union Co.*), the trial court's imposition of the $10,000 restitution fine violated his constitutional rights to a jury trial and due process. He claims that his conviction alone was insufficient to support the imposition of the fine, that the fine was punishment and that, therefore, the issue of the amount of the fine should have been submitted to the jury and proved beyond a reasonable doubt.

As the People point out, a similar contention was rejected in *People v. Kramis* (2012) 209 Cal.App.4th 346 (*Kramis*). The *Kramis* court explained: "In *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*), the United States Supreme Court held, 'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' As the United States Supreme Court explained in *Blakely v. Washington* (2004) 542 U.S. 296, 303 . . . '[T]he "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.' (Some italics omitted.) Stated differently, '[T]he relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he [or she] may impose *without* any additional findings.' [Citation.] Therefore, in sentencing a defendant, a judgment may not 'inflict[ ] punishment that the jury's verdict alone does not allow.' [Citation.] In *Southern Union Co.*, the United States Supreme Court held *Apprendi* applies to the imposition of criminal fines. [Citation.] The statutory fine imposed in

44

*Southern Union Co.* was $50,000 for *each day* of violation. In other words, the amount of the fine was tied to the *number of days the statute was violated.* In *Southern Union Co.*, the trial court, not the jury, made a specific finding as to the number of days of violation. The United States Supreme Court held the district court's factual finding as to the number of days the defendant committed the crime violated *Apprendi*. [Citation.]

"*Southern Union Co.* does not impact the restitution fine imposed in the present case. *Apprendi* and *Southern Union Co.* do not apply when, as here, the trial court exercises its discretion within a statutory range. [Citations.] As the United States Supreme Court held in *Apprendi*, '[N]othing in [the common law and constitutional history] suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to the offense and offender—in imposing a judgment *within the range* prescribed by statute.' [Citations.] As the Court of Appeal for the Fifth Appellate District noted in [*People v.*] *Urbano* [(2005)] 128 Cal.App.4th [396], '*Apprendi* distinguishes a "sentencing factor"—a "circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence *within the range* authorized by the jury's finding that the defendant is guilty of a particular offense"—from a "sentence enhancement"—"the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict" constituting "an increase beyond the maximum authorized statutory sentence." [Citation.]' [Citation.] Nothing in *Southern Union Co.* alters that holding. Under the applicable version of section 1202.4, subdivision (b)(1), absent compelling and extraordinary circumstances, the trial court was

required to impose a restitution fine in an amount between $200 and $10,000. The $10,000 section 1202.4, subdivision (b) restitution fine imposed in the present case was within that statutory range. The trial court did not make any factual findings that increased the potential fine beyond what the jury's verdict—the fact of the conviction— allowed. Therefore, *Apprendi* and its progeny do not preclude its imposition. [Citation.]" (*Kramis*, *supra*, 209 Cal.App.4th at pp. 350–352.)

We find the reasoning in *Kramis* persuasive on this issue. Given that the trial court here imposed a fine *within the range* prescribed by statute, we conclude the court properly exercised its discretion in ordering the $10,000 restitution fine, particularly in light of the seriousness and gravity of the offenses and the circumstances of their commission and the psychological trauma experienced by M. and her family as a result of the sexual assault, as she vividly described to the court during Garcia's sentencing.

V

Correction of the Abstract of Judgment

At sentencing, the trial court in its oral pronouncement of judgment imposed consecutive terms of 25 years to life each on counts 5 and 6 and stayed pursuant to section 654 the seven-year term on count 3, kidnapping, and its section 12022.53, subdivision (b) enhancement. The minute order confirms the court's oral pronouncement of judgment. However, the abstract of judgment indicates that sentence on count 5 and its enhancement were stayed and that the term of 25 years to life was imposed on count 3.

Garcia contends—and the People agree—that the abstract of judgment should be corrected to stay the term for count 3 and its enhancement and to impose the 25 years to life term on count 5 to run consecutively to the unstayed terms. We agree. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185-186 [noting that an "abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize"].)

DISPOSITION

The judgment of conviction is modified to stay under section 654, subdivision (a) the sentence on count 4, burglary with the requisite felonious intent to commit sexual assault. The trial court is directed to prepare an amended abstract of judgment (1) to show this modification and (2) to correct the judgment of conviction as pronounced by the court at sentencing, namely: staying the term for count 3 and its enhancement and imposing the 25-years-to-life term on count 5 to run consecutively to the unstayed terms. The trial court is further directed to forward a certified copy of this amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

BENKE, Acting P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.

47